EXXON CORPORATION and Exxon
Texas, Inc., Petitioners,

v.

EMERALD OIL & GAS COMPANY,
L.C. and Laurie T. Miesch, et
al., Respondents.

No. 05–1076.

Supreme Court of Texas.

Argued Feb. 13, 2007.

Rehearing Granted Nov. 20, 2009.

Delivered April 1, 2011.

Shannon H. Ratliff, Marla Diane Broaddus, Ratliff Law Firm, P.L.L.C., Karen L. Watkins, Patton G. Lochridge, W. Timothy George, McGinnis Lochridge & Kilgore, L.L.P., Austin, S. Jack Balagia Jr., Exxon Mobil Corporation, Byron C. Keeling, Keeling & Downes, P.C., and John E. O'Neill, Howrey, LLP, Houston, for Exxon Corporation.

William J. Joseph Jr., Candace Beth Kaiser Eindorf, Howrey, L.L.P., Alice Oliver–Parrott, Alice Oliver–Parrott, P.C., Maria Teresa Arguindegui, Maria Teresa Arguindegui, P.C., Houston, Elana S. Einhorn, University of Texas School of Law, Austin, Deborah G. Hankinson, Hankinson Levinger LLP, Dallas, for Emerald Oil & Gas Company, L.P.

William J. Joseph Jr., Candace Beth Kaiser Eindorf, Howrey, L.L.P., Hartley Hampton, Fibich Hampton & Leebron, Houston, Michael James Krueger, Sharpe & Krueger, Kingsville, for Laurie T. Miesch.

Michael James Krueger, Sharpe & Krueger, Kingsville, for Other Interested Party Janie Miesch Robertson.

William Guy Arnott III, Winstead PC, Houston, for Amicus Curiae Texas Alliance of Energy Producers.

John B. McFarland, Graves Dougherty Hearon & Moody, P.C., Austin, for Amicus Curiae Texas Land and Mineral Owners' Association.

Everard A. Marseglia Jr., Liskow & Lewis, PLC, Houston, for Amicus Curiae Texas Oil & Gas Association.

David P. Wilson, Darren L. Brown, Provost & Umphrey Law Firm, L.L.P., Beaumont, Eileen F. O'Neill, Ware, Jackson, Lee & Chambers, L.L.P., Houston, for Morgan Francis Dunn O'Connor.

David P. Wilson, Provost & Umphrey Law Firm, L.L.P., Beaumont, for T. Michael O'Connor, Brien O'Connor Dunn, Kelly Dunn Scharr, Bridley Dunn Greeson, Dunn–O'Connor Family Trust, Nancy O'Connor.

Zachary S. Brady, Zachary S. Brady, P.C., Lubbock, for Amicus Curiae Texas and Southwestern Cattle Raisers Association.

William F. Warnick, Texas General Land Office, Austin, for Amicus Curiae Jerry Patterson.

Justice WAINWRIGHT delivered the opinion of the Court.

After issuing our opinion, we granted the parties' motions for rehearing on November 20, 2009 and obtained further briefing from the parties. On December 17, 2010, we issued an opinion on rehearing and modified our judgment. Thereafter, the parties filed second motions for rehearing. Today, we deny the parties' motions, but withdraw our opinion of December 17, 2010 and substitute the following opinion. Our judgment remains unchanged from the one issued December 17, 2010.

In this oil and gas dispute, royalty owners and an oil and gas lessee allege that the previous lessee failed to fully develop oil and gas tracts near Refugio, Texas and sabotaged the wells before abandoning the lease. The lessee's claims at issue in this appeal are for negligent misrepresentation, fraud, and tortious interference with business opportunity. The royalty owners' claims are for statutory and common law waste, breach of alleged regulatory duty to plug wells properly, negligence, negligence per se, negligent misrepresentation, tortious interference with economic opportunity, breach of lease, and fraud. The trial court granted summary judgment on lessee's claims not subject to this appeal and directed a verdict against the lessee on its remaining claims and against the royalty owners on their claims for statutory waste, negligence, negligence per se, tortious interference, fraud, and negligent misrepresentation. The remaining royalty owner claims for statutory and common law waste and breach of contract went to verdict. The jury found in favor of the royalty owners. The court of appeals reversed the directed verdict and affirmed the jury verdict. 180 S.W.3d 299. We reverse and remand to the court of appeals. On December 17, 2010, we also issued our opinion on rehearing in the companion case of *Exxon Corp. v. Emerald Oil & Gas Co.*, 331 S.W.3d 419 (Tex.2010) (reh'g op.).[1]

---

1. We received amicus briefs from Texas Oil & Gas Association, the Texas Alliance of Energy Producers, the Texas Land and Mineral Owners' Association, Texas and Southwestern Cattle Raisers Association, and Jerry Patterson, Commissioner of the Texas General Land Office and Chairman of the School Land Board.

On first rehearing, we received amicus briefs from Susan Combs, Texas Comptroller of Public Accounts, Jerry Patterson, Commissioner of the Texas General Land Office and Chairman of the School Land Board, Texas Oil & Gas Association, and Jacqueline L.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The royalty owners consist of three families—the Miesches, the O'Connors, and the Dunns (collectively the Miesches).[2] They owned mineral interests on several thousand acres of land (the O'Connor Field or Field) in Refugio, Texas. In the 1950s, Humble Oil and Refining Company, a predecessor of Exxon Corporation and Exxon Texas, Inc. (collectively Exxon), began acquiring mineral leases from the royalty owners. Exxon derived its interests from four separate but similar mineral leases with the Miesches. The leases (collectively the Lease or the O'Connor Lease) included an atypical fifty percent royalty obligation and a stringent disclosure clause. During the term of the Lease, Exxon drilled 121 wells and produced at least 15 million barrels of oil and more than 65 billion cubic feet of gas, resulting in the payment of more than $43 million in royalties to the Miesches. In the early 1970s and later in the next decade, Exxon attempted to renegotiate a lower royalty because profitability of the operations was declining. As early as 1987, the royalty owners requested that Exxon provide them information and documentation to support Exxon's position that the field was being depleted and was no longer profitable at the fifty percent royalty. By 1989, Exxon had begun plugging some of the thirty-four wells remaining in operation. The Miesches sent a letter, dated August 30, 1990, advising Exxon "that in the event you [Exxon] plug and abandon any wells [in the O'Connor Field] which are producing or capable of producing minerals in paying quantities to [the royalty owners],

Exxon will be sued under the terms of the lease and the common law, both for present breach of contract and anticipatory damages...."

Walker and McBroom, Inc., a potential operator for the Miesches whom they engaged to evaluate the amount of reserves remaining in the O'Connor Field, advised them by letter of September 4, 1990, that "Exxon has exhausted any value of the field to them, and created substantial environmental hazards" and suggested that the royalty owners pursue Exxon's geologic information of the Field to aid in its future development, "particularly if oil and gas prices substantially rise in the future."

On September 12, 1990, the royalty owners demanded by letter that Exxon deliver all data and documents pertaining to the subject wells, "includ[ing] drilling, production, completion and re[-]completion data, well bore production or completion schematics or diagrams and flow line maps and surface facility diagrams or schematics." In the same letter, the royalty owners warned that "plugging and abandonment of the [six] referenced wells would commit waste and would be contrary to public policy and laws" and that the letter "shall also be considered as formal demand not to plug the above referenced six wells, as such would cause us irreparable harm and commit waste." The royalty owners further informed Exxon that they had "located a group of oil and gas companies that are willing to accept the plugging obligation" and assignment of the O'Connor Lease.

Weaver, A.A. White Professor, University of Houston Law Center.

2. The current royalty owners who are petitioners in this case are: Morgan Dunn O'Connor, T. Michael O'Connor, Brien O'Connor, Kelly Patricia Dunn Schaar, Nancy O'Connor, Bridey Dunn Greeson, individually and on behalf of the Dunn–O'Connor Family Trust, Laurie T. Miesch, Jack Miesch, Michael L. Miesch, Molly Miesch Allen, and Janie Miesch Robertson.

Initially, the royalty owners asserted that Exxon refused to provide any information, claiming that the information was proprietary. Later, Exxon claimed the information was too difficult to locate and retrieve. Then, Exxon agreed to provide the royalty owners a data room containing the requested information subject to a confidentiality agreement. The data room included a large quantity of information, but apparently did not contain the well logs for the plugged wells and did not contain Exxon's opinions and analysis interpreting the data.

Exxon ultimately concluded that it could no longer profitably afford the O'Connor Lease unless the royalty owners agreed to reduce the royalty obligation or assign the leases to third parties. When negotiations to lower the royalty obligation failed, Exxon continued plugging and abandoning the wells. As required by law, after Exxon plugged each of the wells, it filed a plugging report with the Texas Railroad Commission, the department that regulates oil and gas production. 16 TEX. ADMIN. CODE § 3.14(b)(1) (R.R. Comm'n of Tex., Plugging).[3] By letter dated August 16, 1991, Exxon notified the royalty owners that it had completed its plugging operations.

In 1993, after the Lease terminated, the royalty owners entered into a lease agreement with Pace West Production, Ltd. (Pace or Pace West), later known as Emerald Oil & Gas Company, L.C. (Emerald)[4], for approximately one-third of the acreage in the O'Connor Lease. In deciding whether to lease the land, Emerald reviewed Exxon's public filings for the Field, including the oil well plugging reports (W–3 forms) that Exxon filed with the Texas Railroad Commission. The W–3 filings seemed to indicate that Exxon properly plugged the wells. However, Emerald encountered problems from the beginning of its attempts to re-enter the plugged wells, including wellbores plugged with improperly cut casing[5] and other "junk" in the wells, and plugs in locations other than those listed on the reports. The term "junk" is a term of art used in the oil and gas industry to refer to non-drillable material such as steel or iron in a wellbore. *Tarrant County Water Control & Imp. Dist. No. One v. Fullwood*, 963 S.W.2d 60, 66 (Tex.1998) (per curiam); *see* 16 TEX. ADMIN. CODE § 3.14(d)(10) (R.R. Comm'n of Tex., Plugging) (prohibiting, with exceptions, the placement of non-drillable material or junk in the wellbore during plugging operations). Rock Thomas, principal in Re–Entry People, the company hired by Emerald Oil & Gas to re-enter some of the plugged wells on the Lease, explained that "junk" is "something in [the wellbore] that you don't know what it is." Testimony at trial indicated that nuts, bolts, fiberglass pipe, tubing, packers, environmental contaminants and other items were placed in plugged wells in the O'Connor Field.

---

3. Title 16 section 3.14 of the Texas Administrative Code requires well operators to file plugging reports, or W–3 forms, with the Railroad Commission within thirty days after each well is plugged. 16 TEX. ADMIN. CODE § 3.14 (R.R. Comm'n of Tex., Plugging). Section 3.14 mandates that an operator disclose the specific methods used to plug the wells and sign an oath verifying that the statements in the report are true. *Id.*

4. Exxon argues that because Pace West was not formed until 1993, Emerald's fraud claim is foreclosed. The evidence of the identity of Emerald Oil's predecessor raises a fact question on the issue and is discussed further in II.C., *infra.*

5. Exxon does not dispute that it plugged at least some of the wells using non-standard plugging procedures and acknowledges that it cut the casing and cemented it in some of the wellbores.

Emerald sent the royalty owners a written status report on June 8, 1994, explaining that it "encountered junk in [the] hole" in one well, that Exxon had cut the casing in several wells, and that cut and shifted casing had halted re-entry in at least one well. Royalty owners alleged the cut casing in wells in the O'Connor Field caused problems, including increasing costs to re-enter wells, making it impossible to re-enter some wells, and substantially damaging their interests. In January 1995, Emerald obtained Exxon's internal well records on the O'Connor Lease from Quintana, Exxon's partner on the adjoining tract, also leased by Exxon. Exxon's internal records allegedly differed substantially from the Railroad Commission filings regarding its plugging of the wells in the O'Connor Lease. On January 24, 1995, Emerald met with the royalty owners and explained the extent of the alleged Field-wide damage to the wells due to Exxon's plugging techniques.

Concluding that Exxon intentionally sabotaged the field, Emerald sued Exxon in July 1996, and amended the pleading in 1998, claiming breach of regulatory duty to plug wells properly, breach of duty to avoid committing waste of natural resources, negligence per se in violating several sections of the Natural Resources Code and Railroad Commission Regulations, tortious interference with economic opportunity, negligent misrepresentation, and fraud. The fraud claim was predicated on false representations in public filings with the Railroad Commission that the wells were properly plugged.

The royalty owners intervened in the lawsuit in two separate groups in August and September of 1996, and alleged statutory and common law waste, tortious interference with economic opportunity, breach of regulatory duty to plug wells properly, fraud, and environmental claims, and sought various measures of actual damages, exemplary damages, and attorney's fees. In October 1999, the royalty owners amended their petitions, adding claims for breach of contract for Exxon's alleged failure to develop the leasehold, negligence, negligence per se, and negligent misrepresentation.

Reasoning that Exxon owed no duty to future lessees such as Emerald, the trial court granted in part Exxon's motion for summary judgment on Emerald's claims for breach of regulatory duty to plug wells properly, breach of common law and regulatory duties to avoid committing waste, and negligence per se. The court severed the partial summary judgment, and Emerald appealed. The court of appeals reversed and remanded the claims to the trial court. *See Emerald Oil & Gas, L.C. v. Exxon Corp.*, 228 S.W.3d 166 (Tex.App.-Corpus Christi–Edinburg 2005, pet. granted). Exxon appealed that judgment to this Court in cause number 05–0729, and we issued the opinion on rehearing in the companion case on December 17, 2010. *Exxon Corp. v. Emerald Oil & Gas Co.*, 331 S.W.3d 419 (Tex.2010) (reh'g op.).

The case proceeded to jury trial on Emerald's three common law claims (fraud, negligent misrepresentation and tortious interference with economic opportunity) and on all of the Miesches' claims, but the royalty owners abandoned their environmental claims before verdict. The trial court granted a directed verdict in Exxon's favor on Emerald's three remaining claims and on all of the royalty owners' claims except common law and statutory waste and breach of lease. The jury found in favor of the royalty owners on the claims against Exxon for waste and breach of lease, awarding $5 million in actual damages for waste, $10 million in punitive damages for acting with malice in conduct causing injury to the royalty owners, and

$3.6 million in damages for breach of lease. The trial court rendered judgment in accordance with the verdict. All parties appealed. The court of appeals affirmed the judgment in favor of the royalty owners and did not address the Miesches' claims that were dismissed on directed verdict. 180 S.W.3d at 335, 339. It also reversed the directed verdict against Emerald on its claims against Exxon for fraud, negligent misrepresentation, and tortious interference, ruled against Exxon on its affirmative defense of limitations and remanded the claims for a new trial. *Id.* at 339. We granted Exxon's petition for review and issued our opinion. The parties sought rehearing, which we granted, modifying our original judgment and clarifying our opinion.

## II. LAW AND ANALYSIS

### A. Statute of Limitations:

**The Royalty Owners' Claims for Statutory and Common Law Waste, and Emerald's Claims for Negligent Misrepresentation and Tortious Interference**

The royalty owners' claims against Exxon decided in this appeal are statutory and common law waste, breach of lease, and fraud.[6] Emerald's claims against Exxon in this appeal are for fraud, negligent misrep-

resentation, and tortious interference. Exxon asserts that the claims are barred by limitations.[7] The parties do not dispute that a two-year statute of limitations applies to the waste, negligent misrepresentation, and tortious interference claims against Exxon. TEX. CIV. PRAC. & REM.CODE § 16.003(a). Emerald's claim for fraud and the Miesches's claim for breach of lease are subject to four-year limitations periods and are addressed later in the opinion. *See id.* §§ 16.004, .051.

Causes of action accrue and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex.2003); *Johnson & Higgins of Tex. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex.1998). When a cause of action accrues is normally a question of law. *Knott*, 128 S.W.3d at 221; *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex.1990).

In this case, more than two years elapsed between the time that Exxon's asserted tortious conduct damaged the O'Connor Field and the date that Emerald and the Miesches sued Exxon. Emerald and the royalty owners assert that Exxon's plugging operations caused them injury.

---

6. Emerald's claims for statutory and common law waste, breach of regulatory duty to plug wells properly, and negligence per se were dismissed by the trial court in a partial summary judgment ruling, were severed at the trial court, and are the subject of the opinion on rehearing issued in the companion case, *Exxon v. Emerald Oil & Gas Co.*, 331 S.W.3d 419 (Tex.2010) (reh'g.op.). The Miesches' claims for negligence, negligent misrepresentation, negligence per se, tortious interference and breach of regulatory duty to plug wells properly were dismissed by the trial court on directed verdict, and the Miesches conditionally challenged that ruling at the court of appeals.

7. Emerald argues that "Exxon moved for directed verdict based on limitations on only one of Emerald's three common-laws claims, i.e., negligent misrepresentation,"; and thus failed to preserve its argument that the tortious interference and fraud claims are time-barred. In its motion for directed verdict at trial, Exxon argued that all of the claims "are barred by the applicable statutes of limitations." Exxon made the same argument before the court of appeals and raises the issue in this Court. Exxon preserved this issue for our review.

Exxon advised the royalty owners by letter in August 1991 that it had completed plugging all wells in the O'Connor Field. Thus, the alleged tortious conduct occurred by August 1991. Emerald filed suit in June 1996, and the Miesches intervened in the lawsuit in August and September 1996 to assert claims against Exxon. Both Emerald and the Miesches filed suit more than two years after the injuries occurred for these claims. However, Emerald and the royalty owners argue that the law recognizes exceptions to limitations that apply in this case.

Emerald and the royalty owners contend that they filed suit timely because Exxon fraudulently concealed its wrongful conduct, tolling the statute of limitations, and that the nature of their injuries was difficult to discover, thus delaying accrual of their claims. *See Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 736 (Tex. 2001) (distinguishing fraudulent concealment from the discovery rule); *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455–56 (Tex.1996). At trial, the jury found that the royalty owners discovered, or in the exercise of due diligence should have discovered, on January 24, 1995, the waste committed by Exxon. On that date Emerald's representatives met with the royalty owners and informed them, in the words of the court of appeals, "about the full extent of damage to the wells and the numerous discrepancies" in Exxon's plugging reports. 180 S.W.3d at 316. The court of appeals concluded that the statute of limitations was tolled until that date, that the lawsuit filed in the summer of 1996 was therefore timely, and affirmed the trial court's judgment. *Id.* at 316–17. The court of appeals reasoned that "the discovery rule tolls limitations until the [royalty owners] knew of enough damage to know that the problems regarding the wells were not isolated." *Id.* at 317. Emerald and the royalty owners do not dis-

pute that, unless accrual of the cause of action is deferred or the statute of limitations tolled, the two-year statute of limitations bars all of their claims addressed by the court of appeals except fraud and breach of contract, which have four-year statutes of limitations. *See* Tex. Civ. Prac. & Rem.Code §§ 16.004, .051.

### 1. Conclusive Evidence of Emerald's and the Miesches' Knowledge of Problems in the Field

We do not reach the question of the impact of the discovery rule or fraudulent concealment on the limitations period for the pending claims because Emerald and the royalty owners had actual knowledge more than two years before they filed suit of Exxon's alleged wrongful actions and that those actions caused problems or injuries to their interests. The evidence of their actual knowledge is in documents written by or on behalf of Emerald and the Miesches, and it is conclusive. We review the relevant, undisputed facts.

Exxon completed 121 wells in the O'Connor Field and produced both oil and gas over the nearly forty years the parties did business together. By the mid 1980s mineral prices dropped, and production in the Lease declined. Exxon believed the Field was becoming unprofitable at the fifty percent royalty and attempted to negotiate a lower royalty with the Miesches. The effort was unavailing, and in the late 1980s Exxon plugged wells in anticipation of terminating the Lease. The royalty owners were not obligated to accept a lower royalty, and they were not convinced that the Field was uneconomic. The Miesches advised Exxon by letter dated September 12, 1990 that they had received notice that it intended to plug and abandon six wells referenced in the letter. The letter was a "formal demand not to plug

the above referenced six wells, as such would cause us irreparable harm and commit waste," and "would be contrary to public policy and laws." Two weeks earlier, counsel for the Miesches had also warned Exxon in writing that it would "be sued under the terms of the lease and the common law, both for present breach of contract and anticipatory damages" if it plugged and abandoned wells in the Field capable of producing in paying quantities. In their Fourth Amended Petition in Intervention (the live pleading at trial), the royalty owners alleged, separate from their claim for breach of an implied covenant under the Lease to reasonably develop the Field, that they "lost royalties due to [Exxon's] holding the lease but plugging wells instead of producing them." Therefore, by September 1990, the royalty owners had actual knowledge of facts underlying their claim of waste by Exxon for failure to produce available reserves of oil and gas from existing wells on the O'Connor Lease.

Notwithstanding this evidence, even if we assume that the royalty owners were not aware of problems allegedly impacting their lease interests by Exxon's plugging the wells by the time of the September 1990 letter, they assuredly were aware by August 16, 1991. That is the date of Exxon's letter advising them that it had completed plugging and abandoning the remaining wells in the O'Connor Field. Accordingly, limitations forecloses the royalty owners' waste claim.

On first rehearing, the royalty owners argued that their claim for waste actually focused on intentional damage or sabotage to wells in the Lease.[8] The first claim, discussed above, was waste occasioned by abandoning wells that were alleged to still be capable of producing in paying quantities. The second claim was for waste allegedly caused by sabotaging the wells as they were plugged. The royalty owners alleged that Exxon intentionally damaged the wells to hinder or preclude subsequent re-entry of the wells, causing increased re-entry costs, loss of some wells necessitating drilling new wells in some instances, and reduction in revenues they could recover from the O'Connor Field. The wrongful conduct alleged included improperly cutting production casing in the wells, placing junk in the wells, placing plugs in the wells below the surface at undisclosed locations, and pumping contaminants into the wells. They pled that Exxon's conduct damaged the leasehold and interfered with the business opportunity of the royalty

8. Exxon asserts that the Miesches did not raise the second waste claim in the trial court. In this Court, the royalty owners seem to raise this second waste claim involving improper plugging methods used by Exxon to allegedly prevent future re-entry of production from the wells. It is arguable whether the Miesches raised this issue in the trial court as part of their claim for waste (Count 2). In Count 3 (Negligence Per Se) of the Miesches' Fourth Amended Petition in Intervention, they alleged negligence and state that lost royalties from the additional cost of re-drilling improperly plugged wells was the basis of that claim. In Count 2 (Breach of Regulatory Law—Duty Not to Commit Waste) of this Petition, the Miesches complain of "underground waste or loss" resulting from "drilling, equipping, locating, spacing or operating a well or wells in a manner that reduces or tends to reduce the total ultimate recovery of oil or gas from any pool" (quoting TEX. NAT. RES.CODE § 85.046). The Miesches only mention pumping contaminants into the wells in Count 2 (Waste), and specifically mention sabotaging, junking and pumping contaminants into the wells in Count 4 (Tortious Interference), Count 5 (Fraud), and Count 6 (Cost to Re–Enter). So it is arguable whether the Miesches raised the issue of sabotage in their claim for waste in Count 2, while they specifically complained of sabotage or intentional damage to wells in other counts of their pleading. For purposes of our analysis, we will assume the issue was raised in the trial court.

owners to further develop the Field with another operator.

Assuming these allegations are true, which we must for limitations analysis, Emerald and the royalty owners were aware of or suspected problems resulting from Exxon's conduct well before they filed suit. In a June 8, 1994 report, Emerald advised the royalty owners that it discovered that Exxon improperly cut casing in a number of wells and there was "junk" in at least one well Exxon had plugged. The Miesches also acknowledge that Emerald had discovered junk in at least one other well. The royalty owners argue that Emerald's report to them in June 1994 discussing cut casing and junk in a wellbore did not raise suspicion and does not constitute knowledge of damage to the wells. They also claim that the June 1994 letter does not say that Exxon put junk in the wells. The royalty owners' arguments contradict conclusive evidence from the trial, which we set forth in some detail below.

The royalty owners hired Emerald to redevelop a portion of the O'Connor Field after the Lease was terminated. Emerald prepared the June 1994 report for the royalty owners on the status of its efforts to reopen part of the Field. It states, in relevant part:

- "casing had been cut by Exxon at 1400'" for the M.E. O'Connor A–8 well,
- "[c]asing had been cut by Exxon" for the M.E. O'Connor B–11 well,
- "[c]asing had been cut by Exxon" for the M.E. O'Connor E–3 well,

- "[c]asing was cut by Exxon when plugged" for the M.E. O'Connor A–5 well,
- "[c]asing was cut when plugged ... Could not drill past cuts at 1350'" for M.E. O'Connor B–1 well,
- "[c]asing cut by Exxon when plugged" for M.E. O'Connor E–6 well,
- "[c]asing cut by Exxon when plugged.... Casing shifted and collapsed" for M.E. O'Connor A–3 well, and
- Emerald "encountered junk in hole" for the M.E. O'Connor A–10 well.[9]

In addition to junk in well A–10, the report points out that Emerald discovered cut casing in seven wells prior to June 8, 1994. Emerald's principal, Glenn Lynch, testified at length at trial that leaving cut casing in oil wells before sealing them with cement is an improper plugging technique that creates costly and time-consuming problems to re-entering the well for further mineral production, rendered some plugged wells impossible to re-enter and, he believed, was prohibited by Railroad Commission rules.[10] Lynch testified that if casing is cut in the wellbore, it should be pulled. Emerald found cut casing in "the first couple of wells" it attempted to re-enter when it began re-entry of the Field in May 1993.

The alleged junking of the wells and cutting of production casing in the wellbores prior to capping the wells is the conduct that Emerald and the royalty owners characterize as deliberate sabotage of the wells, as violations of Texas laws and

9. The June 1994 report lists two other wells (B–4 and B–5), not included in this list, in which casing had been cut and pulled out of the hole, which Emerald and the Miesches state is the proper procedure.

10. Exxon argues, citing administrative regulations, that cutting casing before plugging

wells is not blanketly prohibited by the Railroad Commission's rules. See 16 TEX. ADMIN. CODE § 3.14(d)(8) (R.R. Comm'n of Tex., Plugging). For purposes of this analysis, we assume the validity of Emerald's and the royalty owners' complaints that leaving cut casing in abandoned wellbores is improper.

Railroad Commission regulations, and as constituting "illegal steps to intentionally and systematically damage the wells to prevent re-entry." There is no dispute that Exxon was responsible for plugging the wells in the Field, and the June 1994 report identifies Exxon throughout the report as the party that had cut well casing in plugging the wells in the O'Connor Field. That was no surprise to Emerald or the royalty owners because Exxon had been the operator in the O'Connor Field for nearly four decades.

The royalty owners argue that they did not appreciate the significance of the statements in the report Emerald sent to them in June 1994. Neither the Miesches nor Emerald contest that the damages Exxon allegedly caused to the leasehold occurred before 1992 or that Emerald and the Miesches knew of improper plugging, cut casing, and junk placed in capped wells in the Field before August 1994, at least to the extent documented in the June 1994 report. The Miesches contend that the evidence of cut casing is not notice that the wells were damaged or the Field was impaired. However, their live pleadings alleged that junk was left in the wellbores, casing was cut in multiple places in the well holes, and these acts of Exxon were the proximate cause of damages to the royalty owners. By June 1994, the royalty owners had actual knowledge of this alleged injury-causing conduct. The September 1990 letter (from the Miesches to Exxon threatening to sue for waste if wells were plugged) and the June 1994 report (the Emerald report to the Miesches alleging damage to the wells) by their terms conclusively establish that the royalty owners knew or suspected there were problems or damages allegedly caused by Exxon to their interests in the O'Connor Lease. The limitations period began to run no later than September 1990 on the first waste claim and no later than June

1994 on the second waste claim. Having actual notice of such problems, the royalty owners had two years under the applicable statutes of limitations to investigate the problems and file suit, or not.

■ Emerald contracted with the royalty owners in May 1993 to re-enter wells and further develop a portion of the Field. It admits to encountering problems in its initial re-entry attempts in 1993. The June 1994 report, which lists the re-entry date for some of the wells, expressly notes that re-entry was commenced in the prior year (1993) for several wells (A–5, B–1, and E–6) and that Exxon had cut the casing in these wells. Emerald also acknowledges that it performed "due diligence in accord with industry practice by reviewing Exxon's sworn Railroad Commission filings" before entering the lease with the Miesches in May 1993. And, Glenn Lynch, a principal in Emerald, testified that eighty to ninety percent of the Commission filings, on which Emerald relied, were inaccurate and that cut casing caused significant problems to re-entry. Thus, Emerald's 1994 report indicates its belief that Exxon's actions allegedly caused further development in the Field to be more difficult, more costly, or impossible and that many problems in the wells were not listed in Railroad Commission reports, at least some of which Emerald had admittedly reviewed prior to entering the lease in 1993.

Emerald filed suit in July 1996, more than two years after the accrual of its causes of action for tortious interference with business opportunity and for negligent misrepresentation arising from allegedly false Railroad Commission filings. The Miesches claimed damages for waste when they intervened in August 1996, more than two years after the September

1990 letter and the June 1994 report. These claims were untimely.

■■■ The court of appeals concluded that the royalty owners were not on notice of the damage to the Lease until January 1995 when the "[royalty owners] knew of enough damage to know that the problems regarding the wells were not isolated." 180 S.W.3d at 317 (citation omitted). The applicable legal standard is the statute of limitations begins to run when a party has actual knowledge of a wrongful injury. *Knott*, 128 S.W.3d at 221. Once a claimant learns of a wrongful injury, the statute of limitations begins to run even if the claimant does not yet know "the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93–94 (Tex.2004) (internal citations omitted); *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex.1997) (holding that the statute of limitations on claim for damage to real property ran as soon as property owner knew of presence of a hazardous chemical on the property, not when the residue exceeded regulatory contamination levels). Emerald and the Miesches had actual knowledge by June 1994 that there were problems re-entering a number of wells in the O'Connor Field due to cut casing or junk. After being put on notice of the alleged harm or injury-causing actions, the claimant must exercise reasonable diligence to investigate the suspected harm and file suit, if at all, within the limitations period. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex.1998) (holding that "[r]oyalty owners cannot be oblivious" to potentially injurious activity taking place in the field); *KPMG Peat Marwick v. Harrison Cnty. Housing Fin. Corp.*, 988 S.W.2d 746, 750 (Tex.1999) (noting that a plaintiff's known loss from a wrongful premature sale of assets should have caused the plaintiff to investigate the mismanagement of the assets as well as a different defendant's involvement in the mismanagement); *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex.1981) (holding that the statute of limitations runs from the time fraud could have been discovered). Knowing that there were problems with re-entering wells in 1993 and documenting them in the June 1994 report, put Emerald and the Miesches on notice of actual or potential injury-causing conduct. Therefore, for limitations purposes, they had a duty to diligently investigate the suspected similar harm by the same operator in the O'Connor Field and file suit on these claims within two years of such notice.

The logic of the court of appeals' holding would create serious issues with application of legislated deadlines for filing actions where injury-causing conduct is known but the full extent of the damages may not be known. In this case, the law accorded both Emerald and the Miesches the statutory two-year period to investigate the problems raised by Emerald and to file claims for damages arising from Exxon's alleged conduct in the Field. The limitations period began when facts came into existence that authorized them to seek a judicial remedy. *See Knott*, 128 S.W.3d at 221. A different rule that delays accrual of the cause of action until the putative claimant knew of enough damage to know the problems regarding the wells were not isolated would cause inconsistent and illogical results. Such a rule would extend the limitations period for a suit arising from the eight wells, known from the June 1994 report to be damaged, beyond the two-year period because, even though those wells were known to be damaged, limitations would not run until many more wells were known to be damaged. Alternatively, application of such a rule would mean that limitations may begin to run on the wells with known damage but not on other

wells in the Field, setting up multiple limitations periods to be applied to different wells in the same Field for the same types of damage caused by the same operator during the same period of time, and undermining or eviscerating the legal duty of an injured party to be diligent in protecting his interests. This is not to mention the difficult and litigious problem of determining when there are enough problems that they are not considered to be isolated. Here, unlike *PPG Industries,* Emerald alleged consistent problems with a high percentage of wells from the beginning of its re-entry efforts. *See* 146 S.W.3d at 93–94. For these and other reasons, we have held that when a person is on notice of injury-causing conduct, the claimant has a duty to use reasonable diligence to discover if he has a claim and, if so, to file it within the limitations period to preserve his right to recover. *HECI Exploration Co.,* 982 S.W.2d at 886.

### 2. Royalty Owners' Testimony Concerning Emerald's June 1994 Report of Problems in the Field

The June 1994 report establishes that Emerald and the royalty owners were made aware of problems caused by Exxon. Emerald prepared the report and sent it to the royalty owners. The trial testimony of the royalty owners concerning this document confirms their knowledge by June 1994 of problems in Exxon's capping of the wells. Three royalty owners testified at trial—T. Michael O'Connor, Morgan Dunn O'Connor, and Laurie T. Miesch. T. Michael O'Connor and Morgan Dunn O'Connor discussed the June 1994 report. Laurie Miesch did not.

 Royalty owner T. Michael O'Connor was a key representative for the royalty owners. At trial he testified:

Question: So, would you agree with me now, Mr. O'Connor, that at least for chronology['s] sake, that in June of '94, you were advised by Mr. Taylor [of Emerald] of *problems they were having reentering the wells because of cut casing and junk in the hole?*

O'Connor: Right here from what I saw from this [June 1994] report that I've seen—I don't remember it, of course, but—yes, they reported that *they had some problems with some wells.*

Question: You don't—you're not suggesting that you didn't receive this letter, are you?

O'Connor: No, I apparently did if it was in my deposition in my file.

(Emphasis added.) O'Connor explained that Emerald advised in the June 1994 report that it encountered problems re-entering the wellbores due to cut casing and "junk in the hole." Emerald contends in its post-submission brief that "T. Michael O'Connor [quoted above] did not understand the [June 1994] letter to mean that Exxon had done anything to deviate from industry standards or had damaged the wells." O'Connor did not state that the report was insignificant or that it did not make him aware of any problems with plugging in the Field. He testified, as cited above, that the report advised of problems with re-entering the wells. He also testified that he was aware of "problems" in Exxon's abandonment of the field, "but I figured it was not necessarily showing some kind of trend of a problem until they came to us in January '95," referring to the date of Emerald's meeting with the royalty owners to explain the extent of damage to wells in the Field. Knowledge of damage to interests need not rise to the level of a "trend" before claimants are charged under the law with notice of its occurrence. As *PPG Industries* states, knowledge of "actual causes and possible cures" or "the full extent of the injury" is not necessary to preclude application of

the discovery rule. 146 S.W.3d at 93–94. Knowledge of injury initiates the accrual of the cause of action and triggers the putative claimant's duty to exercise reasonable diligence to investigate the problem, even if the claimant does not know the specific cause of the injury or the full extent of it. *Id.*

Not having oil and gas expertise, Morgan Dunn O'Connor, a "spokesperson [and] organizational person" for the royalty owners, explained that she "had no idea what the significance of shifting casing was," in reference to a November 1994 letter from Emerald employee Johnny Yocham mentioning the term. Lynch had testified that cutting production casing without pulling it from the well in capping operations may allow the casing to shift such that re-entering a well with offset casing in the well would be difficult if not impossible. Notwithstanding the limits of her technical knowledge, Morgan Dunn O'Connor affirmed that she knew from the June 1994 report that Exxon had cut casing, which had shifted and collapsed in wells it capped in the Field, and also knew of junk left in a well Exxon had capped.

The Miesches claim that these actions by Exxon were intentional acts of sabotage, violated the law, and caused them substantial damages. Although it is not within the scope of our review to determine whether these assertions are true or not, we cannot escape the significance of the documents in the record or these statements by and to the Miesches in light of the question we answer—whether the royalty owners were on notice more than two years before filing suit of Exxon's alleged conduct that they claim caused the damages. The inescapable conclusion is that the royalty owners were aware no later than June 1994 from undisputed facts of conduct they suspected or knew allegedly

injured their property interests. *See City of Keller v. Wilson,* 168 S.W.3d 802, 814–17 (Tex.2005) (explaining that courts conducting a no-evidence review cannot ignore evidence that has one logical conclusion).

We therefore conclude that the assertion of fraudulent concealment to toll limitations and of the discovery rule to postpone accrual of the limitations period is unavailing here. Irrespective of the potential effect of fraudulent concealment or the discovery rule on limitations, actual knowledge of alleged injury-causing conduct starts the clock on the limitations period. *See KPMG,* 988 S.W.2d at 750. Emerald's claims for negligent misrepresentation and tortious interference with business opportunity are barred by limitations. The royalty owners' claims for statutory and common law waste are barred by limitations.

## B. Breach of Lease

The royalty owners claim that Exxon failed to "fully develop" two productive zones in the O'Connor Field, H12 and FS75, in violation of the Lease's development clause. Exxon counters that the royalty owners misread the term "fully develop" in the development clause, Article 3, and instead incorporate a provision from Article 4 that is a separate covenant that does not define Exxon's obligation to develop the Field. The court of appeals affirmed the trial court's judgment, holding that the testimony of the royalty owners' expert, George Hite, was some evidence that the Field was capable of further production in paying quantities until 1999 and that Exxon did not drill and complete wells in two productive zones, H12 and FS75.[11] 180 S.W.3d at 334–35. Exxon contends no evidence supports the jury's finding that Exxon failed to fulfill its obli-

---

11. The royalty owners and Hite used "hori- zon," "stratum," and "zone" interchangeably.

gations under the development clause of the oil and gas Lease.[12]

There are four oil and gas lease agreements, and the development clauses in them have somewhat different terminology. At trial, the parties used the Lease as the source of the terms and conditions of the parties' obligations, and Exxon acknowledged that the terms of the leases were similar.[13] The development clause is Article 3 of the Lease. Article 4 also contains relevant provisions.

> **Article 3(a).** [L]essee covenants and agrees to prosecute diligently a continuous drilling and development program until said tract is *fully developed* for oil or gas.
>
> . . .
>
> First Tract shall be deemed fully developed within the preceding paragraph of this Article if found to be productive of oil or gas or sulphur when there has been drilled to each horizon or stratum capable of producing oil or sulphur one (1) well for the number of acres fixed by the Railroad Commission . . . in determining the spacing pattern applicable to said First Tract; in the absence of such determination of a spacing pattern by said Railroad Commission . . . said First Tract shall be deemed *fully developed* when at least one (1) well has been drilled and completed in each horizon or stratum capable of producing oil or sulphur in paying quantities for each twenty (20) acres of said tract. First Tract shall be deemed *fully developed* within the intent of the preceding paragraph if found to be productive of gas only when one (1) well has been drilled and com-

pleted to each horizon or stratum capable of producing gas in paying quantities for the number of acres fixed by the Railroad Commission . . . in determining the spacing pattern applicable to said tract for the production of gas, or, in the absence of such determination, one (1) well for each one hundred sixty (160) acres of said tract so capable of producing gas in paying quantities.

> **Article 4.** By the words "with diligence," *"diligence,"* or "diligently," as used in this instrument, is meant, in each instance, that degree of action, conduct and effort which is consistent with that which would characterize the action and conduct and effort of a prudent and skillful oil operator possessed of ample equipment, material and money, and unhampered by obligations to third parties, and actuated by an honest desire to carry out and fulfill in good faith each and every obligation imposed upon the lessee by this lease. Lessee shall always develop and operate the leased premises for the production of oil and gas in accordance with the best practices of the industry at the applicable time, to the end that the full value of the leased premises for oil and gas shall be ascertained, conserved, and realized.

(Emphasis added).

 Before we address the legal sufficiency of the evidence, we must first determine the scope of Exxon's development obligations under the Lease. "An oil and gas lease is a contract, and its terms are interpreted as such." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex.

---

**12.** The jury also found that Exxon fraudulently concealed its breach and that the royalty owners did not know, and could not have known with due diligence, that Exxon fraudulently concealed its failure to fully develop until February 1999 when Exxon produced previously requested documents during dis-

covery. For the reasons that follow, we need not reach the royalty owners' fraudulent concealment claim.

**13.** The specific terms at issue are from the Lease, Plaintiffs' Exhibit 1 at trial.

2005); *accord Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex.2005) (interpreting an oil and gas lease using contract principles). "In construing an unambiguous oil and gas lease, ... we seek to enforce the intention of the parties as it is expressed in the lease." *Tittizer*, 171 S.W.3d at 860.

### 1. General Development Obligation—Article 3

The Lease contains a development clause, Article 3. The general development obligation in Article 3(a) relied on by the Miesches requires Exxon to "prosecute diligently a continuous drilling and development program until said tract is *fully developed* for oil and gas." (Emphasis added). The next paragraph of Article 3(a) then provides definitions of "fully developed" for oil and gas.

### 2. The Obligation to "Fully Develop"—Article 3

The Field "shall be deemed fully developed within the intent of the preceding paragraph of this Article" when at least one well has been drilled and completed in each horizon capable of producing oil or gas in paying quantities for each twenty acres of land for oil production and for each 160 of land for gas production.[14] This is a common definition in an oil and gas lease development clause. 4 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 671.4, at 136.1 (3d ed.2008).

■ To understand the obligation to "fully develop," one must know the meaning of "drill" and "complete" in the development clause. The Lease does not define "drill" or "complete." It is a well recognized canon of construction that technical words are to be interpreted as usually understood by persons in the business to which they relate, unless there is evidence that the words were used in a different sense. *Barrett v. Ferrell*, 550 S.W.2d 138, 142 (Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.). In oil and gas parlance, "drilling" refers to the "[a]ct of boring a hole through which oil and/or gas may be produced if encountered in commercial quantities." 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW: MANUAL OF OIL AND GAS TERMS at 281–82 (3d ed.2008). A "completed well" refers to "a well *capable* of producing oil or gas." *Id.* at 172 (emphasis added). The "completion of a well" can also refer to "those processes necessary before production occurs [such as] perforating the casing and washing out the drilling mud." *Id.* at 174.

■ Certainly, the parties can define the operator's duty to drill and complete a well differently under a contract. For example,

> [c]ompensation for drilling an oil or gas well may be made contingent upon the discovery of oil or gas in paying quantities, but a contract will not be so construed in the absence of a clear expression or implication of such intent by the contract.... The courts in construing contracts for the drilling of wells are not disposed to imply warranties as to production.

*Barrett*, 550 S.W.2d at 142 (holding that a well was completed even though it was a

---

14. Article 3(b) provides the same general obligation for the Second Tract and includes the same definition of "fully developed" for both oil and gas production, but in the Second Tract the duty requires "one (1) well," rather than "at least one (1) well" be completed for oil as in the First Tract. The trial judge inquired whether the Lease language was ambiguous and was advised by the parties that it was unambiguous. They raise no distinctions in the obligations between the First and Second Tract in this Lease, or obligations regarding other tracts in the three remaining leases.

dry hole) (citing W.L. SUMMERS, THE LAW OF OIL AND GAS § 687 (perm. ed.1938)). These definitions in the Lease show that for a well to be considered "drilled and completed" as required by the development clause, a hole must be bored in the ground, and if oil or gas in paying quantities is encountered, the casing must be perforated or otherwise prepared for production. The Article 3(a) development clause does not obligate the operator to produce all oil and gas that can be produced in paying quantities. The duty is to drill and complete at least one well "capable" of producing in paying quantities. The term "in paying quantities" specifies a characteristic of the well to be drilled, not the volume of production required. The royalty owners' statement of the duty omits the "in paying quantities" term, but all four definitions in the Lease of "fully develop" in Article 3(a) for oil and for gas in each tract include this language.[15]

 This definition of a completed well in the treatises, where the term is not defined in an oil and gas lease, is also the one recognized by Texas courts. *See id.* at 142 (citing *Cannon v. Wingard*, 355 S.W.2d 776, 780 (Tex.Civ.App.-Dallas 1962, writ ref'd n.r.e.)). A "well need not be a producing well to be completed"; it only needs to be capable of producing oil or gas. *Id.; Seale v. Major Oil Co.*, 428 S.W.2d 867, 869 (Tex.Civ.App.-Eastland 1968, no writ) (noting that completion of a well does not mean it is an oil or gas producer, but "refers to completion of the required work on the well whether it becomes a producer or not").

### 3. Diligence—Article 4

 Article 4 of the Lease contains two sentences. The first sentence defines "diligence," a term used in the general development clause in Article 3(a). It is defined as the conduct of a prudent and skillful oil operator actuated by an honest desire to fulfill in good faith each obligation in the Lease. Although not argued to the court of appeals or mentioned in the court of appeals' opinion, the Miesches argue in this Court that the second sentence of Article 4 sets out the determinative language for defining Exxon's duty to develop the Field:

> Lessee shall always develop and operate the leased premises for the production of oil and gas in accordance with the best practices of the industry at the applicable time, to the end that the full value of the leased premises for oil and gas shall be ascertained, conserved, and realized.

Royalty owners argue, in effect, that this term is a warranty of a level of production—to produce all oil and gas in each zone per the specified acreage for each well that can be produced in paying quantities. While not an unreasonable agreement to strike, the question is whether the Lease contained that obligation given its somewhat less burdensome definition of the development obligation in Article 3(a), discussed above.

Articles 3 and 4 are the determinative provisions in the dispute over the development obligation.[16] The Miesches contend

---

15. The royalty owners set out the duty as: "The leases are fully developed only when 'at least one (1) well has been drilled and completed in each horizon or stratum capable of producing oil or sulphur for each twenty (20) acres of said tract.'" In the Lease, the phrase "in paying quantities" occurs after the word "sulphur."

16. On initial rehearing, an amicus curiae brief by Professor Jacqueline Weaver of the University of Houston Law Center argued that we should determine Exxon's obligations by searching the entire oil and gas Lease. Certainly, the parties' obligations to each other concerning oil and gas operations in the O'Connor Field are determined by all 43 arti-

that under the Lease, Exxon was required to develop the tract fully by not only drilling and completing in each zone an oil well for every twenty acres and a gas well for every 160 acres, but also developing the oil and gas to realize the full value from each well in each horizon. They acknowledge that under Article 36, Exxon had a right to abandon the Lease, but contend it could do so only after producing the "full value" of oil and gas available in the O'Connor Field.[17]

At trial, the Miesches' expert, Hite, opined that Exxon should have drilled or reworked an additional fifteen wells in the FS75 zone and additional wells in the H12 zone to fully develop those zones. Although he acknowledged that Exxon would have had to commit an additional $2 million to continue producing from the Field, he opined that wells in those two zones would have produced oil and gas in paying quantities for an additional eight years after the Field was abandoned in 1991. However, in this Court, the royalty owners acknowledge that Exxon complied with the spacing requirements of Article 3 of the Lease—to complete at least one well in every zone for each twenty acres for oil and one well completed in every zone for each 160 acres for gas—and do not argue that Exxon had a duty to drill additional wells in the Field. Likewise, the Miesches do not argue that Exxon had a duty to drill additional wells in the H12 or FS75 zones.

They take the position in this Court that Exxon breached the Lease by failing to produce all the oil and gas in horizons H12 and FS75 that was available in paying quantities from existing wells. Hite's charts of the production from the wells in the O'Connor Lease were admitted at trial. The charts show that Exxon drilled at least one well in each zone and produced 3,651,850 cubic feet of gas and 78,746 barrels of oil in zone FS75 and 1,728,728 cubic feet of gas and 3,933 barrels of oil in zone H12. Hite agreed that Exxon drilled at least one well in FS75 and at least one well in H12 and both wells produced in paying quantities in each zone.[18]

The Miesches argue that Exxon "did not complete every well in the H12 and FS75 zones." They also contend that the Article 3 duty to "complete" the wells required Exxon to produce all oil and gas in zones H12 and FS75 available in paying quantities. The Miesches equate "complete" with the Article 3(a) duty to "fully develop" and define "fully develop" as fully realizing all oil and gas available in paying quantities in each zone per the specified acreage.

The royalty owners' analysis of Articles 3 and 4 of the Lease contradict its express terms and do not harmonize the terms in those Articles. As we noted, Article 3(a) of the Lease expressly provides that the duty to fully develop is satisfied by only drilling one well in each zone per the designated acreage and preparing it for pro-

---

cles in the 26 pages of the Lease. However, on appeal, we address only those issues properly brought before us. The Miesches have not mentioned, much less argued, in this Court any articles in the Lease other than 3, 4 and 36 prior to rehearing. They argue Articles 3 and 4 in a few sentences in their brief and mention Article 36 in a footnote. Rather than attempt to predict which issues in a contract the parties should pursue, our analysis is limited to the issues they raise.

**17.** We need not address this contention under Article 36 as surrendering the Lease does not relieve Exxon of its obligations under Article 3.

**18.** Notwithstanding this testimony from their expert, the royalty owners argue that the "records reflected that Exxon had not produced from the only two wells completed in the H12 zone."

duction, even in the unlikely event that no production occurs. That obligation is less onerous than producing all oil and gas available in paying quantities from the wells in the two zones. As a matter of law, Exxon completed wells in zones H12 and FS75 by not only drilling them and preparing them for production, but producing significant quantities of hydrocarbons from those zones, according to Hite's numbers.

There is a difference between Article 3's obligation to fully develop the tracts and Article 4's obligation to realize the full value of the tracts. Fulfilling the duty in Article 3 to complete a well in each horizon would not satisfy Article 4. The former duty arises from the development clauses in Article 3. The royalty owners do not contend that Exxon had a duty to drill more wells, and likewise do not contend in this Court that the wells completed should have pierced additional zones in the Field. They concede that zones H12 and FS75 were pierced by wells Exxon drilled but contend that the zones were not sufficiently worked to realize their full value. They contend that Article 4's requirement to realize the "full value" of operations is incorporated into the general development obligation of Article 3, even though "fully developed" is the development duty specifically defined later in Article 3. Article 4 does not include this sentence in the definition of "diligence"; it defines "diligence" in the first sentence. The Miesches position would mean that "fully developed" means one thing in the general development obligation of Article 3(a) and something different in a latter paragraph of Article 3(a),

which defines "fully develop" as drilling and completing at least one well in each zone on specified acreage for oil or gas production. There is no reference in Article 3 to an obligation to realize the full value of available hydrocarbons. To bridge that gap, the Miesches argue that "completing" a well, a term in the specific development obligation in Article 3(a), means realizing its full value per Article 4. But the Lease does not define completion of a well, and nothing in Articles 3 or 4 indicates that completion means to realize the full value, or all hydrocarbons available in paying quantities of each zone for the specified acreage. And the second sentence of Article 4 does not state that it is part of the definition of "diligently" or that it defines "completed" wells.[19]

■ Hence, under one interpretation of the Lease, we are confronted with two different duties, both expressly set forth in the Lease and one contradictory to the other.[20] Where an ambiguity has not been raised by the parties, the interpretation of a contract is a question of law. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006). The duty to fully develop in Article 3(a) is less onerous and is inconsistent with a duty to fully develop as defined by the Miesches in Article 4. We attempt to harmonize these provisions while giving effect to both. If the second sentence of Article 4 is the preeminent duty, it would vitiate the definition of "fully develop" in Article 3(a). *See Valence Operating Co. v. Dorsett,* 164

19. Amicus Professor Weaver also concludes that Article 4 is an express covenant that "is separate and apart from any development obligations in Article 3."

20. No party argues that the Lease is ambiguous. The trial judge inquired of the parties on more than one occasion whether the Lease terms are ambiguous. The parties maintained that they are not. However, at least one amicus brief acknowledges that the provisions of Articles 3 and 4 are not entirely consistent. Notwithstanding this, royalty owners contend the Court should give effect to the "full value" language in Article 4 but should not enforce the definition of "fully develop" in Article 3.

S.W.3d 656, 662 (Tex.2005) (holding that courts should harmonize the provisions of a contract such that none are rendered meaningless). Article 3 provides the definition of this duty. It expressly defines "fully develop" and states that the tracts of land "shall be deemed fully developed *within the intent of the preceding paragraph.*" (Emphasis added). The preceding paragraph is the general development obligation that introduced the term "fully develop" in the Lease; the second paragraph in Article 3(a) defines "fully develop." Article 3(a) is more specific than Article 4 in addressing the development obligations in the Lease. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133–34 (Tex.1994) (noting that a specific contractual provision controls over the general provision concerning the same issue); *Southland Royalty Co. v. Pan Am. Petroleum Corp.,* 378 S.W.2d 50, 57–58 (Tex.1964) (holding specific provision for payment of gas royalty controls over a less specific provision).

The second sentence of Article 4 includes aspirational terminology that Exxon operate in accordance with the best practices of the industry "to the end" and that the full value of the Lease be "ascertained, conserved and realized." Article 3(a)'s development language is mandatory.

Clearly the extent of the duty to develop was defined by the parties in Article 3. Holding that Article 4 trumps this defined duty would render meaningless Article 3(a)'s specifically defined obligation to "fully develop" and potentially eliminate the spacing requirements for wells drilled in the Lease and require more wells (subject to applicable Railroad Commission regulations) to fully realize the mineral horizons. Where the Lease expressly defines the duty, we will not impose a more stringent obligation unless it is clear that the parties intended to warrant production beyond that defined obligation. *See Barrett,* 550

S.W.2d at 142. This reading of the Lease harmonizes and gives effect to both articles. We conclude that the parties' expressed intent was to define in Article 3(a) the duty of the operator to develop the O'Connor Field. The aspirational language in Article 4 informs the duties in Article 3 such that they should be performed in accordance with the best practices of the industry with the goal of fully developing the tracts.

### 4. Evidence of Fulfillment of Development Duty

 Having ascertained the scope of Exxon's development obligations, we now turn to Exxon's argument that the evidence is legally insufficient to support the breach of lease claim. Because Exxon is attacking the legal sufficiency of the evidence supporting an adverse finding on an issue for which it did not have the burden of proof, Exxon must show that no evidence supports the jury's adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller,* 168 S.W.3d at 827. We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*

Hite testified that "fully developed" means there are a "sufficient number of wells in it to get the reserves." And when asked whether Exxon completed "in the FS75 and the H12, in every well, that Exxon had good probability of producing oil and gas in those two zones," he answered "[n]o, they didn't." However, when asked whether "drilling the H12 and completing it in two wells complete[d] that zone in the wells on this tract that would penetrate that zone in paying quantities," he answered "[i]f your question is, did the

two wells fully develop the lease, the answer is no." Asked whether the wells Emerald completed in FS75 were "completed in a fully-developed manner," he answered "[n]o, it was not." Hite opined that Exxon violated the Lease by not producing more extensively, or exhausting the production, from the wells in zones H12 and FS75. He testified that zones H12 and FS75 had remaining reserve potential and that Exxon had information indicating they "could have been developed further."

Hite's stated assumption for his opinions is that "fully develop" meant to fully exploit the reserves in zones H12 and FS75. As we explained, the duty undertaken under the language of the development clause is to fully develop, not fully exploit the zones. Under the contractual standard in the Lease, the evidence does not support Hite's conclusions. Hite's charts of the production from the wells in the O'Connor Lease, admitted at trial, show that Exxon drilled at least one well in each zone and produced 3,651,850 cubic feet of gas and 78,746 barrels of oil in zone FS75 and 1,728,728 cubic feet of gas and 3,933 barrels of oil in zone H12. The royalty owners submitted evidence establishing that Exxon drilled at least one well in both zones FS75 and H12 and both wells produced in paying quantities. They also conceded that the well spacing requirements were met. Evidence that further development potential existed when Exxon abandoned the leasehold in 1991 is no evidence that Exxon failed to comply with the parties' obligations embodied in the development clause. And evidence that Exxon did not fully exploit the reserves in FS75 and H12 is no evidence that Exxon did not

"drill and complete" the requisite number of wells for zones FS75 and H12. The evidence establishes that Exxon completed at least one well capable of producing in paying quantities in each zone for every twenty acres for oil and every 160 acres for gas. Therefore, we reverse the court of appeals' judgment and render judgment in favor of Exxon on the royalty owners' breach of lease claim.[21]

## C. Fraud

 Unlike most of Emerald's and the royalty owners' other claims, which have a two-year statute of limitations, the statute of limitations for fraud is four years. TEX. CIV. PRAC. & REM.CODE § 16.004(a)(4). The statute of limitations for fraud begins to run from the time the party knew of the misrepresentation. *Little v. Smith*, 943 S.W.2d 414, 420 (Tex.1997) ("[T]he statute of limitations does not begin to run until the claimant knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act.").

Emerald claims that Exxon committed fraud by filing plugging reports (W–3s) with the Railroad Commission that deliberately misrepresented that it properly plugged the wells when it did not. That conduct allegedly caused Emerald increased costs to re-enter wells and made re-entry of some wells impossible resulting in loss of revenues. At trial, the royalty owners asserted fraud both for filing false W–3s and misrepresenting the remaining reserves in the O'Connor Field. At the court of appeals, having recovered on other claims, the Miesches conditionally ap-

---

21. Because we conclude no evidence supports the royalty owners' breach of lease claim, we need not reach the issue of whether the claim is time-barred or whether the doctrine of fraudulent concealment tolls the statute of limitations. *See Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 352 n. 1 (Tex.1990) (noting that the doctrine of fraudulent concealment estops a defendant who conceals the existence of a cause of action from asserting the statute of limitations as an affirmative defense).

pealed the trial court's fraud judgment but only on the issue of the remaining reserves.

The trial court granted Exxon's motion for directed verdict on both Emerald's and the Miesches' fraud claims, therefore, there was no fact finding identifying the dates that Emerald learned of alleged false plugging reports or that Exxon allegedly misrepresented the reserves to the royalty owners. However, Emerald notes that "the first place subsequent operators turn is to those very filings at the Railroad Commission when deciding whether redevelopment can be economically undertaken." Lynch testified that Emerald reviewed the W–3s for the Field. The June 1994 letter states that Emerald encountered cut casing in the wells on the O'Connor Lease in 1993 and junk in the well prior to June 1994. Thus, Emerald may have learned about the asserted misrepresentations on or around that date. Based on either of these dates, the fraud claim filed by Emerald would be timely, and therefore, we reach the merits of Emerald's fraud claim.[22]

### 1. Emerald's Fraud Claim

■■■ The court of appeals reversed the trial court's directed verdict on Emerald's fraud claim, holding that the jury should have been allowed to consider whether the evidence was sufficient to establish fraud. It asserted that the evidence did not conclusively disprove the intent-to-induce reliance element of the fraud claim. In reviewing a trial court's directed verdict, we examine the evidence in the light most favorable to the person suffering an adverse judgment and decide whether there is any evidence of probative value to raise an issue of material fact on the question presented. *Henderson v.*

*Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976). We do not hold that public filings, such as Railroad Commission reports, alone satisfy the intent-to-induce reliance element of fraud. We conclude there was some evidence presented at trial tending to show that Exxon knew, at the time it filed the plugging reports, of an especial likelihood that the identified future operators would rely on the inaccurate plugging reports. We, therefore, agree with the court of appeals on this issue.

■■■ A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *See DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983).

Emerald claims that Exxon committed fraud by misrepresenting material information in its plugging reports to the Railroad Commission with the intent that known lessees and lessors of such mineral interests would rely on the information in the future. Emerald claims, as a result of its reliance, that it is entitled to damages measured by "the value of lost wells and minerals, the additional costs of reentering those wells that were improperly plugged, [and] the increased risk of loss of producing zones and wells due to improper plugging." The court of appeals held that

---

**22.** This opinion does not preclude the parties on remand from seeking to establish the date on which Emerald learned of the alleged misrepresentations.

evidence that Exxon knew that unidentified, subsequent lessees and operators might rely on Railroad Commission filings to make business decisions was sufficient to satisfy the intent-to-induce reliance element of fraud. 180 S.W.3d at 337. Exxon argues that the court of appeals' decision is erroneous for two reasons. First, Exxon argues there is no evidence that future operators would rely on the plugging reports because the reports' only purpose is to allow the state to protect against pollution. Second, Exxon argues that Emerald's approach reduces the intent-to-induce reliance element of fraud to mere foreseeability, counter to the Court's analysis in *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co.*, 51 S.W.3d 573, 580 (Tex.2001).

We begin with the duty to plug wells. "Proper plugging is the responsibility of the operator of the well." 7 Tex. Reg. 3991 (1982) (16 Tex. Admin. Code § 3.14(c)(1)), *amended by* 23 Tex. Reg. 9304 (1998) (current version at 16 Tex. Admin. Code § 3.14(c)(1) (R.R. Comm'n of Tex., Plugging)). The Railroad Commission mandates:

> Non-drillable material that would hamper or prevent re-entry of a well shall not be placed in any wellbore during plugging operations.... Pipe and unretrievable junk shall not be cemented in the hole during plugging operations without prior approval by the district director or the director's delegate.

16 Tex. Admin. Code § 3.14(d)(10) (R.R. Comm'n of Tex., Plugging). Exxon argues that this section and similar plugging requirements are not intended to benefit future operators, but only to protect the environment. Thus, Exxon argues, no evidence supports Emerald's argument that there was an especial likelihood that Exxon knew future operators would rely on

the reports because that is not the reports' purpose.

Although the Railroad Commission explained that it revised section 3.14 "to protect fresh water in the state from pollution," the plugging reports are not limited to this purpose. 7 Tex. Reg. at 3989. One of the objectives of the plugging regulations is to prevent plugging of wells that hinder or prevent re-entering wells, which could be desired by the same or subsequent owners or operators. *Id.* To police this regulation, the Commission requires that the W–3 plugging reports be verified under oath, be filed within thirty days after the plugging is completed, and disclose the methods used to plug a well. *Id.* at 3991. Thus, the purpose of requiring operators to file plugging reports with the Commission is to ensure that operators follow a plugging procedure that not only prevents pollution, but also allows re-entry into the wells for commercial purposes.

 However, the mere fact that subsequent lessees might or should rely on statements in Exxon's plugging reports alone is not sufficient to establish an intent to induce reliance, as the court of appeals held and as Emerald argues. *Ernst & Young*, 51 S.W.3d at 580. In *Ernst & Young*, we considered the proof necessary to establish the intent-to-induce reliance element of a fraud claim. Although we declined to decide whether to adopt the reason-to-expect standard outlined in section 531 of the Restatement (Second) of Torts, we concluded that this standard is consistent with Texas fraud jurisprudence. *Id.* Section 531 provides:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifi-

able reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced. RESTATEMENT (SECOND) OF TORTS § 531 (1977). Like the defendants in *Ernst & Young*, Exxon argues that this approach reduces the intent-to-induce element to a foreseeability standard. We rejected that argument in *Ernst & Young*, holding that section 531's "reason-to-expect standard requires more than mere foreseeability; the claimant's reliance must be 'especially likely' and justifiable, and the transaction sued upon must be the type the defendant contemplated." *Ernst & Young*, 51 S.W.3d at 580; *see also Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 922 (Tex.2010) (quoting *Ernst & Young*, 51 S.W.3d at 575). Evidence that reliance on false public information as part of a general industry practice is insufficient, as a matter of law, to prove an intent to induce reliance. *See Ernst & Young*, at 581–82. Even an obvious risk that a misrepresentation might be repeated to a third party is not sufficient to satisfy the reason-to-expect standard. A plaintiff must show that "[t]he maker of the misrepresentation [has] information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct." RESTATEMENT (SECOND) OF TORTS § 531 cmt. d (1977), *quoted in Ernst & Young*, 51 S.W.3d at 581. The standard is not met if a defendant merely foresees that some party may rely on statements made in a public filing.

■ Therefore, if the evidence shows only that Exxon made material misrepresentations in its plugging reports to the Railroad Commission and knew that lessors and operators in the future may rely on the filings, such evidence would fail as a matter of law under the *Ernst & Young* standard. *See Ernst & Young*, 51 S.W.3d

at 581–82. Such a holding would open the cause of action to any person who subsequently relied on any public filings—including stocks and bonds, security interests, real property deeds, and tax filings—with few limits in sight. The intent-to-induce reliance element of fraud is a focused inquiry, more akin to a rifle shot than a shotgun blast. Intent-to-induce reliance is not satisfied by evidence that a misrepresentation may be read in the future by some unknown member of the public or of a specific industry.

Here, however, there is some evidence that Exxon knew of an especial likelihood that Emerald specifically would rely on the plugging reports in a transaction being considered at the time it filed the plugging reports. In 1990, Exxon concluded that it could no longer profitably operate the leases unless Exxon's royalty obligation could be renegotiated. The negotiations failed, and Exxon abandoned the field, plugging the last well in the O'Connor Lease in 1991. In their letter of September 12, 1990 to Exxon, the royalty owners stated, "[W]e have located a group of oil and gas companies that are willing to accept the plugging obligations and an Assignment of the above referenced [six] wells [and certain acreage around each well]." They also offered their consent to assign all of Exxon's right, title, and interest in the leases to several companies and indicated their interest in future oil and gas operations in the Lease.

In 1989, "Pace Production Company" expressed that it was "most anxious to proceed" with production in the O'Connor Lease and offered to purchase Exxon's interest. It renewed its offer in January 1990. By letter of July 23, 1990, Exxon advised each of the royalty owners that "Pace Production Company" had expressed an interest in the Lease. On May 25, 1993, Pace West Production acquired

the interests to develop the Lease from the royalty owners.

Exxon knew the royalty owners had a continuing interest in further developing the O'Connor Lease, received offers from the putative subsequent lessee to purchase Exxon's interest in the Lease, and knew the transaction proposed by the Miesches and Emerald's predecessors was the continued production of oil and gas in a portion of the Lease. Exxon argues that the company that made an offer on the Miesches' oil and gas interests was "Pace Production Company," which is a different company from Emerald's alleged predecessor "Pace West Production." Therefore, it contends the trial court properly granted its motion for directed verdict. In reviewing a directed verdict, we decide whether there is any evidence of probative value to raise an issue of material fact on the question presented, and we review the evidence in the light most favorable to the person suffering the adverse judgment. *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex.2004) (citation omitted); *Henderson v. Travelers Ins. Co.*, 544 S.W.2d 649, 650 (Tex.1976) (citations omitted). In this case, the presence of some evidence of any entity other than "Pace West Production" as the predecessor to Emerald will defeat the directed verdict. We searched the record to answer this question.

Exxon's correspondence in 1989 and 1990 concerning the sale of its lease in the O'Connor Field called the entity that expressed interest in purchasing the Lease "Pace Oil & Gas Company," "Pace Petroleum Company," and "Pace Production Company." T. Michael O'Connor, one of the royalty owners, testified that he could not distinguish between "Pace and Pace West." At the relevant time concerning the fraud claim, there is evidence that the parties involved—Exxon and the royalty owners—used at least five names, at times interchangeably, for the entity that was interested in purchasing the O'Connor lease from Exxon. A May 25, 1993 "Agreement for Waivers" between Emerald and the royalty owners states that Emerald was the successor to two different Pace West entities as it was "formerly known as Pace West Production, L.C., and also formerly known as Pace West Production, Ltd." An undated "Memorandum of Amended Oil and Gas Lease and Security Agreement" states that Emerald was formerly known as "Pace West Production, L.C." and also as "Pace West Production, Ltd." Exxon contends that "Pace West" is a different entity from "Pace Production Company," but, as noted, T. Michael O'Connor testified that he could not distinguish between "Pace and Pace West." Although Exxon points out, in its second motion for rehearing, that there is evidence that "Pace West Production, L.C." was not created until 1993, after the time the alleged misrepresentations were made, that does not address the evidence that Emerald was also formerly known as the different entity, "Pace West Production, Ltd." In sum, the evidence raises a fact issue and precludes granting a directed verdict on the issue.[23]

■ Thus, legally sufficient evidence in the record supports the claim that Exxon had information that would lead a reasonable person to conclude there was an especial likelihood Emerald would rely on Exxon's allegedly inaccurate filings with the Railroad Commission. The question of

---

**23.** We decide that there is legally sufficient evidence contrary to Exxon's factual position; therefore, it was error for the trial court to grant the directed verdict. We do not suggest that the parties cannot clarify this factual question before the trial court in future proceedings.

whether the W–3s are inaccurate is not before us and we do not decide it. We hold that the trial court erred in granting a directed verdict on Emerald's fraud claim on the ground that there was no evidence of the intent-to-induce element of the claim. Accordingly, the trial court's grant of directed verdict on the fraud claim on this basis was in error.[24]

### 2. Royalty Owners' Remaining Claims

At the court of appeals, the royalty owners defended the trial court's judgment in their favor on the waste and breach of lease claims and conditionally challenged the trial court's directed verdict on their claims for negligence, negligence per se, negligent misrepresentation, tortious interference with economic opportunity, breach of regulatory duty to plug wells properly, and fraud in allegedly making misrepresentations of the remaining reserves in the O'Connor Field. They asserted that their fraud claims are not precluded by the Lease and are supported by the evidence. The court of appeals upheld the trial court's judgment in their favor and did not address the claims the royalty owners conditionally challenged. The royalty owners briefed the claims conditionally appealed to the court of appeals, but did not address those claims before this Court. They did, however, identify the unbriefed issues. We therefore remand those issues to the court of appeals.

### III. CONCLUSION

We hold the royalty owners' statutory and common law waste claims, and Emerald's negligent misrepresentation and tortious interference claims are time-barred and reverse and render judgment for Exx-

on with respect to those claims. We also hold that the evidence conclusively establishes that Exxon satisfied its duty to develop the Field and reverse and render judgment for Exxon with respect to the breach of Lease claim. We affirm the court of appeals' judgment, for different reasons, reversing the trial court's directed verdict in favor of Exxon on Emerald's fraud claim. Finally, we remand the case to the court of appeals (1) to consider the royalty owners' claims for fraud, negligence, negligent misrepresentation, negligence per se, tortious interference with economic opportunity, and breach of regulatory duty to plug wells properly, and (2) to remand Emerald's fraud claim to the trial court for further proceedings.

Justice GUZMAN and Justice LEHRMANN did not participate in the decision.

---

**24.** Emerald claims that it is entitled to damages that include profit on lost mineral production due to the alleged fraud. Because this issue was not presented to this Court, we need not address it. However, we note that

the "measure of damages in a fraud case is the actual amount of the plaintiff's loss that directly and proximately results from the defendant's fraudulent conduct." *Tilton v. Marshall,* 925 S.W.2d 672, 680 (Tex.1996).