# NO. 12-11-00133-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *NACOGDOCHES HEART CLINIC, P.A., PRABHAKAR R. GUNIGANTI, M.D., AND EAST TEXAS CARDIOVASCULAR LABS, LLC, APPELLANTS/CROSS-APPELLEES* | § | *APPEAL FROM THE 145TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *VIJAY R. POKALA, M.D. d/b/a NACOGDOCHES CARDIAC CENTER, APPELLEE/CROSS-APPELLANT* | § | *NACOGDOCHES          COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

This suit arose out of a disagreement between the parties to an Employment Agreement. Nacogdoches Heart Clinic, P.A. (NHC), Dr. Prabhakar R. Guniganti, M.D., and East Texas Cardiovascular Labs, L.L.C. appeal from the trial court's judgment, rendered after a series of directed verdicts and summary judgments, and finally a jury trial. They raise five issues concerning the enforceability of a covenant not to compete, unjust enrichment, the award of a corporate distribution, and attorney's fees. Dr. Vijay R. Pokala, M.D., doing business as Nacogdoches Cardiac Center, raises five issues regarding recovery of the value of his shares in NHC pursuant to a Buy-Sell agreement between NHC, Guniganti, and Pokala; the trial court's refusal to submit certain requested jury questions; and the sufficiency of the evidence to support the jury's finding as to the value of his shares in NHC pursuant to the Employment Agreement. We affirm in part and reverse and render in part.

BACKGROUND

Guniganti, a cardiologist, opened NHC in 1984. Pokala, also a cardiologist, began working for NHC in 1989. The two doctors opened an outpatient laboratory known as East Texas Cardiovascular Labs, L.L.C. (the Cath Lab). Guniganti owns 65% of the Cath Lab, and Pokala owns 35%. They signed regulations governing operation of the Cath Lab. In 1999, Pokala paid $1,050,000.00 to buy a 45% ownership interest in NHC. Several documents memorialized the transaction including a Buy-Sell Agreement, By-laws, an Employment Agreement for each doctor, and a Stock Sale and Purchase Agreement.

On February 2, 2006, Guniganti and Pokala had a dispute about a patient after which Guniganti decided that Pokala could no longer work at NHC. The two were unable to reconcile. On Monday, February 6, 2006, Pokala opened his new office and later his own cath lab. Two weeks later, NHC and Guniganti filed suit against Pokala. The Cath Lab was later added as a plaintiff. They sued for breach of the Employment Agreement and sought to enforce the covenant not to compete. They also requested a declaratory judgment that, pursuant to the Buy-Sell Agreement, Pokala's shares in NHC were cancelled and had no value, and pursuant to the Stock Sale and Purchase Agreement, Guniganti owned a 55% interest in Pokala's clinic. They also alleged fraud and negligent misrepresentation. Additionally, Guniganti alleged that Pokala had been unjustly enriched when Guniganti satisfied a loan from Nacogdoches Memorial Center Hospital.

Pokala countersued NHC, Guniganti, and the Cath Lab for, among other things, breach of the Buy-Sell Agreement and the Employment Agreement. He sought to recover $233.00 per share for his 4500 shares in NHC, one month's salary, and his 35% distribution from the Cath Lab from 2006 until the trial.

The trial court disposed of several claims by three partial summary judgments, and those are not attacked on appeal. The court ruled as a matter of law that the covenant not to compete in the Employment Agreement was unenforceable, Pokala could not recover the original value of his shares under the Buy-Sell Agreement, and that NHC had to pay only $100.00 to cancel all of his shares. The remainder of the issues were submitted to the jury, which decided that Guniganti was not unjustly enriched and Pokala was not entitled to $233.00 per share for his interest in NHC. The jury also determined that Pokala was entitled to $109,350.00 for one month's salary

and the Cath Lab owes Pokala $45,906.70 for his share of Cath Lab income for 2009. The final judgment awarded those actual damages and attorney's fees.

**EMPLOYMENT AGREEMENT PARAGRAPH 19**

In its first issue, NHC asserts that the trial court erred in granting a directed verdict in favor of Pokala on NHC's claim for liquidated damages under Paragraph 19 of the Employment Agreement. NHC argues that the trial court's position, "that the public interest trumps [NHC's] right to damages because communities like Nacogdoches need cardiologists[,] is wrong on *every* level." NHC argues that the trial court inappropriately considered a public-interest factor outside the governing statutory framework, rested its ruling on mere suspicion and surmise, impermissibly stacked inferences that are speculative and thus no evidence, ignored the paramount public interest in freedom of contract and the benefits of physician noncompete covenants, misdirected its analysis, and elevated an ordinary and impermissible local bias to the status of a paramount public interest. NHC argues that the contract's liquidated damages provision is reasonable and enforceable and triggered by Pokala's conduct.

## Standard of Review

A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment. *White v. White*, 172 S.W.2d 295, 296 (Tex. 1943). A defendant establishes a right to a directed verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery or when the plaintiff admits, or the evidence conclusively establishes, a defense to the plaintiff's cause of action. *Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

In reviewing a trial court's directed verdict, an appellate court follows the standards for assessing the legal sufficiency of the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823-27 (Tex. 2005). We examine the evidence in the light most favorable to the person suffering an adverse judgment and decide whether there is any evidence of probative value to raise an issue of material fact on the question presented. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011). We credit favorable evidence if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 807.

**Applicable Law**

A covenant not to compete, that is, a covenant that places limits on former employees' mobility or restricts their solicitation of the former employers' customers, is a restraint on trade and will not be enforced unless it is reasonable. *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (op. on reh'g); *Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830, 832 (Tex. 1991). The enforceability of a covenant not to compete is a question of law for the court and thus subject to de novo review. *Light v. Centel Cellular Co.*, 883 S.W.2d 642, 644 (Tex. 1994); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990) (op. on reh'g). A covenant not to compete is enforceable if (1) it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made (2) to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained (3) that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. Act of May 29, 1993, 73rd Leg., R.S., ch. 965, § 1, 1993 Tex. Gen. Laws 4201 (amended 1999, 2001, 2009) (current version at TEX. BUS. & COM. CODE ANN. § 15.50 (West 2011)). If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, the promisee has the burden of establishing that the covenant meets the statutory criteria. *Id*. § 2(b) (current version at TEX. BUS. & COM. CODE ANN. § 15.51(b) (West 2011)).

Courts may properly decline to enforce a contract, or a provision in a contract, on the ground that it is against public policy and therefore substantively unconscionable. *Sec. Serv. Fed. Credit Union v. Sanders*, 264 S.W.3d 292, 297 (Tex. App.–San Antonio 2008, orig. proceeding). Courts generally find a contract violates public policy if it is illegal, or inconsistent with or contrary to the best interest of the public. *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 727 (Tex. App.–Dallas 2004, no pet.). In examining an agreement to determine if it is contrary to public policy, the court must look for a tendency to be injurious to the public good. *Sacks v. Dallas Gold & Silver Exch., Inc.*, 720 S.W.2d 177, 180 (Tex. App.–Dallas 1986, no writ). Whether a contract is contrary to public policy and unconscionable at the time it is formed is a question of law. *Sanders*, 264 S.W.3d at 297. Thus, in determining reasonableness of the covenant not to compete, the court considers whether the promisee's need for the protection

4

given by the agreement is outweighed by any injury likely to the public. ***Peat Marwick Main & Co. v. Haass***, 818 S.W.2d 381, 386 (Tex. 1991).

**Discussion**

Both Guniganti and Pokala entered into employment agreements as employees of NHC. Paragraph 19 of their agreements is entitled "Covenant Not to Compete." It provides in pertinent part as follows:

> Furthermore, on the termination of Physician's employment as provided in this Agreement, Physician expressly agrees that he shall not engage or participate, directly or indirectly, either as an employee, employer, consultant[,] agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, in the practice of medicine, within ten (10) miles of the city limits of the City of Nacogdoches, Texas, for a period of one (1) year. It is expressly agreed by Physician that should Physician, following termination of this Agreement, be found to have violated the provisions of this covenant not to compete, Physician will pay to Association, as agreed, liquidated damages, the sum of $100,000.00 per month for each month, or portion thereof, during which Physician is found to have violated the covenant not to compete. It is also agreed and stipulated that this contractual agreement as to damages for past violations of the covenant not to compete, will in no way effect [sic] Association's right to an injunction to prevent any future or continuing violations of the covenant not to compete, and it is expressly agreed by Physician and Association that Association will be entitled to an injunction, [sic] against future violations, in addition to the stated damages, in all cases in which this covenant is violated or is being violated.

After NHC and Guniganti rested, Pokala moved for a directed verdict arguing entitlement to judgment as a matter of law on NHC's claim based on the covenant not to compete in Paragraph 19. Pokala asserted that Paragraph 19 is unenforceable because it is too broad in scope; that is, it prevented Pokala from practicing any type of medicine, not just cardiology. Additionally, he argued that the provision is injurious to Pokala's patients who were in the hospital at the time and to the public for lack of cardiology coverage at Nacogdoches Memorial Hospital. Finally, he argued that the provision is vague as to the geographical territory to which the restriction applies.

The trial court determined that the covenant not to compete adversely affects the interest of the public and is therefore unreasonable and unenforceable. The court explained that "we're a small community" and "the public interest would be adversely affected, and that being, access to cardiac care." He noted that Pokala testified that he gets up to six calls a night and works

5

eighteen hour days. Noting that the population is aging, the court explained that, unlike large cities where there are "dozens and dozens of cardiologists," there is a need for cardiologists in "this small community." Further, "for one doctor to be taken out of the equation hurts the medical care of the people." The judge also explained that he was considering the fact that Paragraph 19 prohibits Pokala from practicing any medicine at all, not just cardiology. Based on the testimony, the court found that the covenant not to compete is unreasonable and therefore unenforceable.

The court named two reasons for granting the directed verdict: the covenant was overbroad and it adversely affects the public interest. The evidence supports both. As an employee of NHC, Pokala practiced internal medicine and cardiology. Nevertheless, the covenant not to compete required him to stop practicing all medicine within ten miles of Nacogdoches, not just cardiology and internal medicine. Pokala would be prohibited from practicing medical specialties that would not compete with NHC. There is no evidence that a complete bar to practicing medicine within ten miles of Nacogdoches is necessary to protect the goodwill or other business interest of NHC. Therefore, the covenant was overbroad. Thus, the restraint is greater than necessary and the covenant does not comply with Section 15.50. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 965, § 1, 1993 Tex. Gen. Laws 4201 (amended 1999, 2001, 2009).

In attacking the trial court's second reason for granting the directed verdict, NHC asserts that the validity of the covenant not to compete can be determined by considering only the two criteria named in Texas Business and Commerce Code Section 15.50. NHC argues that the public interest factor considered at common law was omitted by the legislature. We disagree. Section 15.50 is a codification of the rule of reason, of which the public interest is one factor. *See Marsh USA, Inc.*, 354 S.W.3d at 772-73; *DeSantis*, 793 S.W.2d at 681; *Matlock v. Data Processing Sec., Inc.*, 618 S.W.2d 327, 329 (Tex. 1981). Thus, the trial court properly considered a public interest factor. In addition to application of the statute, because the employment agreement containing the covenant is a contract, it is also governed by contract law. Public policy is a valid consideration when determining the enforceability of a contract. *Sanders*, 264 S.W.3d at 297.

"As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding). As a fundamental matter, Texas law recognizes and protects a broad freedom of contract. *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008). However, freedom of contract is not unbounded. *Id*. The legislature determines public policy through the statutes it passes. *Id*. at 665. The purpose of Chapter 15 of the Texas Business and Commerce Code, known as the Texas Free Enterprise and Antitrust Act, is to maintain and promote economic competition in trade and commerce occurring in Texas. TEX. BUS. & COM. CODE ANN. § 15.04 (West 2011). Contracts in restraint of trade are illegal, and therefore, against public policy. TEX. BUS. & COM. CODE ANN. § 15.05 (West 2011). Unreasonable limitations on employees' abilities to change employers or solicit clients could hinder legitimate competition between businesses and the mobility of skilled employees. *Marsh USA, Inc*., 354 S.W.3d at 769. The legislature passed the Act to prohibit restrictions on employee mobility that impede competition, while allowing employers and employees to agree to reasonable restrictions on mobility that are ancillary to or part of a valid contract having a primary purpose that is unrelated to restraining competition between the parties. *Id*. at 770.

NHC further argues that the trial court's ruling should not stand because it ignores "the paramount public interest in freedom of contract" and the specific benefits of physician noncompete covenants. We are unpersuaded by this argument because consideration of these factors is implicit in the trial court's ruling.

Whether an agreement will be unenforceable on public policy grounds will be determined by weighing the interest in enforcing agreements versus the public policy interest against such enforcement. *Fairfield Ins. Co.,* 246 S.W.3d at 663. On one side of the scale is Texas' general policy favoring freedom of contract. *Id*. Courts weighing this interest should consider the reasonable expectations of the parties and the value of certainty in enforcement of contracts generally. *Id*. On the other side of the scale is the extent to which the agreement frustrates important public policy. *Id*. at 663-64. It is appropriate to consider whether enforcement of the covenant not to compete would harm the public interest by resulting in inadequate healthcare or continuity of care and depriving the public of access to the physician of its choice.

7

NHC contends that the court's ruling rests on mere suspicion and surmise and stacks speculative inferences, which do not prove an overarching public interest. NHC misconstrues the trial court's comments that Nacogdoches is a small community. We think the trial court was entitled to recognize that the number of cardiologists needed is in proportion to the population of the community while surmising that the population of large cities will support "dozens and dozens of cardiologists." The court never said, as alleged by NHC, that "being a 'small community,' [Nacogdoches] needs all the doctors it can get." The court said, "[F]or one doctor to be taken out of the equation hurts the medical care of the people." And this statement was based on the evidence.

Pokala was board certified in internal medicine at the time he moved to Nacogdoches in 1989 and continued to practice a "fair amount" of internal medicine. He testified that, since 1989, he has taken care of indigent patients. He explained that there are "a lot of" emergency patients and indigent patients in the community and they need to be seen. He never refuses a patient who cannot pay. The majority of his practice is through Memorial Hospital, the county hospital that takes indigent patients. He testified that Tim Hayward, the hospital administrator, indicated to him that "[a] lot of" patients depend on him and would suffer if he leaves. According to Pokala, Guniganti did not like to treat patients for free. Pokala stated that, at the time he opened his cath lab in 2006, there were two other cardiologists in Nacogdoches. He also said there are a total of four cath labs available in Nacogdoches. Even Guniganti wanted patients to have a choice of doctors and did not intend to force Pokala to leave town.

Tim Hayward, hospital administrator of the Nacogdoches Hospital District, testified by video deposition. He explained that, prior to February 2006, there was a shortage of cardiovascular physicians in Nacogdoches County. He said that Guniganti agreed and offered his office for Hayward to bring in another doctor to provide more coverage. Hayward stated that, after the February 2006 event, he continued to have to look for cardiovascular physicians. That was one of the reasons he wanted to make sure Pokala was stabilized, "because him leaving would have destabilized the availability of cardiovascular care in Nacogdoches County, and certainly the coverage of [the] emergency room." Hayward was concerned about the injurious effect on the public at large for the provision of cardiovascular services. He explained that

8

having internists cover for Guniganti when he was unavailable was not acceptable coverage for cardiovascular care.

William Guidry, an attorney who represents the Nacogdoches County Hospital District, explained that if Pokala was prohibited from seeing his patients in the hospital, the hospital would be required to find care for those patients who would then lose continuity of care, putting the patients at a disadvantage. Guidry testified that the hospital district considered intervening in this lawsuit due to its concern for the continuity of care of Pokala's patients.

Rather than resting on "mere suspicion and surmise," as NHC asserts, the trial court's ruling rests on testimony that the extraction of one busy cardiologist from Nacogdoches would have a detrimental effect on the public at large. Hayward testified that, before and after February 2006, there was a shortage of cardiovascular physicians. Pokala's absence would jeopardize continuity of care for his patients. Furthermore, Pokala's absence would mean the hospital emergency room would be inadequately covered. Additionally, the indigent population of Nacogdoches County would be underserved if Pokala could not practice in that county because he never refused to take a patient who could not pay, while Guniganti does not like to take patients who could not pay. Contrary to NHC's assertion, the trial court's public interest analysis is not so lacking in factual underpinnings as to be vacuous.

Furthermore, the court's determination that Nacogdoches would be underserved if Pokala could no longer practice medicine there does not constitute a conclusion that the public has an overriding interest in forcing NHC, rather than Pokala, to bear the financial consequences of Pokala's competition. An inquiry into the public interest in medical care is not concerned with any damage provision in the covenant. If NHC did not want to bear financial consequences from a potential violation of the covenant not to compete, it was incumbent upon it to draft a covenant that did not violate public policy. It was NHC's burden to prove that the covenant met the statutory criteria. TEX. BUS. & COM. CODE ANN. § 15.51(b).

NHC argues that the public's interest in health care is amply protected if the particular remedy imposed does not unduly impair public access. It argues that even when a prohibition on the practice of medicine is held void, contractual liquidated damage clauses should be enforced. We disagree. When Pokala entered into the Employment Agreement, he agreed that, following termination of the agreement, if he violated the provisions of the covenant not to compete, he

9

would pay to NHC $100,000.00 per month for each month during which he is found to have violated the covenant not to compete. The $100,000.00 amount was based on Pokala's earnings while at NHC. That is the monthly amount NHC paid to Pokala. It was not the amount of actual damages NHC expected to incur if Pokala left the clinic. The liquidated damages provision is a mechanism to enforce the covenant not to compete, and is due only if the covenant is breached. *Hunke v. Wilcox*, 815 S.W.2d 855, 857 (Tex. App.–Corpus Christi 1991, writ denied). Further, an action for damages may not be predicated upon the breach of an unenforceable noncompetition agreement. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 663 (Tex. 1990). As explained above, the covenant not to compete in the employment agreement is unenforceable. Therefore, NHC is not entitled to the liquidated damages referenced in Paragraph 19.

Furthermore, in order to enforce a liquidated damage clause, the harm caused by the breach must be incapable or difficult of estimation and the amount of liquidated damages called for must be a reasonable forecast of just compensation. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). A damages provision that does not meet this test is an unenforceable penalty. *Id*. Enforcement of a penalty violates public policy. *Id*. at 789-90. Courts will not enforce a plainly illegal contract even if the parties do not object. *Id*. at 789. The amount Pokala was to pay NHC was based on his earnings while at NHC, the amount NHC paid to Pokala. It was not the amount of actual damages NHC expected to incur if Pokala left its employ. Thus, the liquidated damage provision is an unenforceable penalty. *Id*. at 788.

NHC did not raise a fact issue on enforceability of the covenant; that is, whether prohibiting Pokala from practicing medicine in Nacogdoches would impose a greater restraint than is necessary. Conversely, the evidence conclusively establishes that the covenant not to compete is unenforceable. Pokala proved entitlement to judgment on NHC's breach of contract claim as a matter of law. *See Sanders*, 264 S.W.3d at 297. Thus, the trial court did not err in granting a directed verdict in favor of Pokala on that claim. *See White*, 172 S.W.2d at 296. We overrule NHC's first issue.

10

## BUY-SELL AGREEMENT

In 1999, an agreement was made between NHC, a professional association, and Guniganti and Pokala, the shareholders. The document, entitled "Buy-Sell Agreement," governed NHC's stock, including the method by which the shares could be transferred. Article 3 is entitled "Forced Sale" and states that termination of employment of a shareholder will result in the sale and purchase of that shareholder's shares as provided in that article. Pertinent portions of that article are as follows:

> 3.1 [T]he closing of any sale and purchase of Shares shall occur effect [sic] as of the end of a calendar month within ninety (90) days after the occurrence of the triggering event.
>
> 3.2 [NHC] shall purchase . . . the [departing shareholder's] Shares . . . at the price determined in Paragraph 3.8.
>
> 3.8 [T]he parties have agreed that the per Share purchase price of each Share of [NHC's] Shares shall be $233.00 per share.
>
> 3.9 The value given to the Association's Shares under Paragraph 3.8 shall be binding and conclusive on all parties.
>
> 3.10 It shall be a condition precedent to any obligation of the Association or its remaining Shareholders to purchase any Shares under this Article that the "decedent", if actually living, shall resign from the medical staff of all hospitals at which Shareholder provides services as an employee of the Association and shall execute a written agreement not to compete as required under Shareholder's employment agreement with the Association. If a selling Shareholder fails or refuses to comply with these conditions precedent, his Shares shall be deemed to have a value of $100.00 and upon the tender of the payment of such amount to the selling Shareholder, the Association may cancel the selling Shareholder's Shares and the same shall thereafter have no value.

After NHC and Guniganti rested, Pokala moved for a directed verdict on NHC's claim that Pokala was not entitled to recover the value of his shares in NHC. He asserted that Section 3.10 of the Buy-Sell Agreement contained an unenforceable covenant not to compete and his failure to comply with that paragraph should not excuse NHC from purchasing his shares at full value. The court denied the motion. After Pokala rested, NHC and Guniganti moved for a directed verdict on Pokala's cause of action for NHC's failure to repurchase his stock. The court found that Pokala did not perform the requisite condition precedent, that is, he did not resign from the hospitals as required by Section 3.10. Therefore, NHC had no obligation to buy his

shares and Pokala could not recover his $1,048,500.00 investment for his NHC shares. The court ruled that the requirement of the condition precedent was not waived by Guniganti's actions at the hospital board meeting. Additionally, the court found that the $100.00 mentioned in Section 3.10 refers to the entire investment paid by Pokala and not $100.00 per share.

## Section 3.10 Condition Precedent

In his first issue, Pokala asserts that the trial court erred in ruling as a matter of law that Pokala could not recover the full value of his shares under the Buy-Sell Agreement. He argues that the condition precedent requiring him to resign from the hospital was an unenforceable covenant not to compete. Pokala contends that the primary purpose of the documents signed by the parties was to establish Pokala as a shareholder in NHC and obligate him to render personal services as an employee of NHC. He contends that the provision was unenforceable because its restrictions as to time and scope of activity and the harm to the public that it created were greater than necessary to protect NHC's legitimate business interests. Finally, he argues, whether NHC waived the condition precedent was a question for the jury, and there is legally sufficient evidence from which the jury could have found that NHC waived the condition precedent in Section 3.10 by Guniganti's comments at the hospital's Board of Directors' meeting.

## Standard of Review

A defendant establishes a right to a directed verdict when the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co.*, 29 S.W.3d at 77. A directed verdict in favor of a plaintiff on his cause of action is proper under Texas Rule of Civil Procedure 268 only when the evidence conclusively establishes a party's right to judgment as a matter of law. *See Kline v. O'Quinn*, 874 S.W.2d 776, 785 (Tex. App.–Houston [14th Dist.] 1994, writ denied). If there is any evidence of probative value raising an issue of fact on any material question presented, a directed verdict is improper. *Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 304 (Tex. 1988). If the trial court erred in denying a directed verdict, the appellate court will reverse and render the judgment that the trial court should have rendered. *Horton v. Horton*, 965 S.W.2d 78, 89 (Tex. App.–Fort Worth 1998, no pet.).

## Applicable Law

The essential elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by

12

the defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l, LLC*, 51 S.W.3d 345, 351 (Tex. App.–Houston [1st Dist.] 2001, no pet.). A breach may occur where a party fails to perform in accordance with the stipulations of the contract. *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.–Houston [1st Dist.] 2003, pet. denied).

A condition precedent is an act or event that must occur before there is a right to immediate performance and before there is a breach of contractual duty. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976). A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998). If an express condition is not satisfied, then the party whose performance is conditioned is excused from any obligation to perform. *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010).

**Analysis**

The Buy-Sell Agreement governs NHC's stock. Section 3.10 contains an express condition precedent, requiring that once a physician leaves NHC, he must resign from the hospitals where he provided services as an employee of NHC before NHC has any obligation to purchase his shares at full price. Thus, the condition must occur before NHC is required to perform. *Id*. A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way. *Id*. By signing the Buy-Sell Agreement, Pokala did not merely agree to resign from the hospitals, a prohibition on competition. He agreed that, to obtain full price for his shares, he would resign from the hospitals. Thus, Section 3.10 includes both a covenant not to compete and a forfeiture provision.

NHC argues that the contingent provision in Section 3.10 does not threaten the competitive process. Under this provision, the argument continues, Pokala had a choice that was just an economic decision, not a restraint of trade. NHC opines that "the contingent possibility of a buy-back right is a natural, commonplace, and perfectly lawful carrot by which to align the parties' interests."

For the assertion that there is no public policy preventing the conditional award of stock options, NHC relies on *Monsanto Co. v. Boustany*, 73 S.W.3d 225 (Tex. 2002). However, that

13

case involved the grant of stock options and the interpretation of the incentive plan's meaning of the phrase "termination of employment." *Id*. at 227. There was no discussion of a noncompete clause. NHC also relies on ***Dollgener v. Robertson Fleet Services, Inc.***, 527 S.W.2d 277 (Tex. App.–Waco 1975, writ ref'd n.r.e.). That case involved a profit sharing pension plan that included a clause providing that the former employee would forfeit all interest in the plan if he became a competitor of the employer. The Waco court of appeals held that the forfeiture provisions in the noncontributory profit sharing pension trust before it were not covenants not to compete. *Id*. at 280. Instead, it held, the clause in question was a valid condition to the right to receive post-termination benefits from such a trust. *Id*. NHC also relies on ***Bobbitt v. National Comp Associates***, 597 S.W.2d 28 (Tex. App.–Dallas 1980, writ ref'd n.r.e.). There, the Dallas court considered a contract in which the former employee's right to commissions on renewal premiums rested on a condition that he refrain from competition. That court found that the parties' agreement was not in restraint of trade. *Id*. at 30. In essence, the court held that the ex-employee was free to compete if he was willing to forego the commissions. *Id*.

We decline to follow ***Dollgener*** and ***Bobbitt***. As stated by San Antonio's Chief Justice Cadena, "The argument that a forfeiture provision is not a prohibition against the employee's engaging in the conduct which results in the forfeiture is unacceptable." ***Sw. Bell Tel. Co. v. Gravitt***, 551 S.W.2d 421, 426 (Tex. Civ. App.–San Antonio 1976, writ ref'd n.r.e.). The invalidity, on public policy grounds, of a restriction or restraint depends on the nature of such restriction or restraint, and not on whether it is expressed in the form of a promise or in the form of a condition that results in a divestiture of rights. *Id*. at 427. Citing cases from other jurisdictions, Chief Justice Cadena explained that, under the minority view, the forfeiture clause is viewed as being no different from a covenant by which the employee agrees not to become employed by a rival company and to pay a penalty for doing so. *Id*.

In 1982, the Texas Supreme Court considered a case from the Dallas court of appeals involving a contract that forbade an insurance agent from competing with his former employer and provided that he would forfeit his commissions if he did not comply with the contract. In ***Frankiewicz v. National Comp Associates***, 633 S.W.2d 505 (Tex. 1982), the court explained that the appellate court had construed ***Bobbitt*** to hold that Frankiewicz was free to compete as long as he was willing to forego renewal commissions. The supreme court specifically declined

to follow that reasoning. *Id*. at 507; *see also **Drennen v. ExxonMobil Corp.***, 367 S.W.3d 288, 295 (Tex. App.–Houston [14th Dist.] 2012, pet. filed) (held that provisions in employer's stock incentive programs that imposed severe economic penalty on former employee if he competes were noncompetition agreements and unenforceable under Texas law).

We conclude that the condition precedent requiring Pokala to resign from the medical staff of all hospitals where he provided services as an employee of NHC is actually a covenant not to compete. *See **Frankiewicz***, 633 S.W.2d at 507. The covenant not to compete cannot be enforced unless it is reasonable. ***Marsh USA, Inc.***, 354 S.W.3d at 768. That is, it must contain limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than necessary. Act of May 29, 1993, 73rd Leg., R.S., ch. 965, § 1, 1993 Tex. Gen. Laws 4201 (amended 1999, 2001, 2009). The Buy-Sell agreement, in Section 3.1, provides that "[u]nless otherwise provided, the closing of any sale and purchase of Shares shall occur effect [sic] as of the end of a calendar month within ninety (90) days after the occurrence of the triggering event." Here, the triggering event was Pokala's departure from employment with NHC in February 2006. Therefore, the time for the sale was limited to the period ending May 31, 2006. The geographical area was limited to the two Nacogdoches hospitals where Pokala had privileges at the time of his departure from employment with NHC. The scope of the restraint was limited to his resignation from those two hospitals. Close inspection of this requirement reveals that the restraint is in violation of the statute.

Guniganti testified that for a cardiologist to practice medicine, it is required that he have staff privileges at any hospital where he practices. It follows that, if Pokala cannot see patients at the hospitals in Nacogdoches, he cannot practice cardiology in Nacogdoches. This brings us to the same public policy considerations we discussed in connection with the covenant not to compete in the Employment Agreement. Under the facts of this case, given the well-developed and strong evidence of the adverse effects that enforcement of the covenant not to compete would have on the community, we determine that the public policy interests invalidate the covenant not to compete clause in the Buy-Sell Agreement. Accordingly, Section 3.10 of the Buy-Sell agreement does not comply with Section 15.50. *See **id***.

Therefore, the trial court erred in denying Pokala's motion for directed verdict in which he asserted that Section 3.10 contained an unenforceable covenant not to compete. *See **Kline***,

15

874 S.W.2d at 785.  Additionally, because NHC and Guniganti failed to prove that Pokala did not comply with a valid condition precedent, the trial court erred in granting NHC and Guniganti's motion for directed verdict on Pokala's claim for full payment for his NHC shares, which was based on application of the "condition precedent" in Section 3.10.  S*ee **Prudential Ins. Co.**, 29 S.W.3d at 77.  The trial court erred in not finding in Pokala's favor on that claim.

Because the "condition precedent" was actually an unenforceable covenant not to compete, we need not address Pokala's argument regarding whether NHC waived the condition precedent by Guniganti's comments at the hospital's board of director's meeting.  We sustain Pokala's first issue.

## Requested Jury Question on Value of Shares

In his second issue, Pokala asserts that the trial court erred in refusing to ask the jury to interpret the last sentence in Section 3.10 and determine the value of his shares.  That provision, however, applies only "[i]f a selling Shareholder fails or refuses to comply with these conditions precedent."  As we have determined that the "condition precedent" need not be complied with, the valuation language in Section 3.10 is void.  We need not reach Pokala's second issue because it is moot.

## Timeliness of Tender

In his third issue, Pokala asserts that because NHC did not tender payment for his shares by the end of the calendar month within ninety days of his termination as required by Section 3.1, NHC does not have the right to cancel his shares pursuant to Section 3.10.  That section provides that if Pokala fails to comply with the condition precedent, NHC may cancel his shares upon tender of payment.  Because we have determined that the "condition precedent" need not be complied with, NHC cannot cancel Pokala's shares pursuant to Section 3.10.  We need not reach Pokala's third issue because it is moot.

## EMPLOYMENT AGREEMENT PARAGRAPH 15

In his fourth issue, Pokala contends that the jury's finding that he was not entitled to the full value of his NHC shares under the Employment Agreement is not supported by the evidence. He asserts that there are two potential explanations for the jury's verdict and that the verdict is not sustainable under either rationale.  First, he asserts, the jury could have found that he waived

his right to have NHC purchase the shares by denying that he executed an employment agreement. Second, the jury might have found that he waived his rights because he did not resign from the hospital as required by Section 3.10 of the Buy-Sell Agreement.

Question 4 and its accompanying instructions are as follows:

Is Vijay R. Pokala, M.D. entitled to receive $233.00 per share for his interest in Nacogdoches Heart Clinic, P.A. as provided under Paragraph 15 of the Employment Agreement?

You are hereby instructed that waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

If you find Vijay R. Pokala, M.D. waived compliance with Paragraph 15 of the Employment Agreement, answer "No."

Paragraph 15 of the Employment Agreement provided that "[i]n all cases of termination of this contract . . . the Physician shall be obligated to sell his shares in [NHC] and [NHC] shall be obligated to buy Physician's shares in [NHC] at the purchase price stated in Section 3.8 of the Buy-Sell Agreement." Section 3.8 provided that the parties agreed that the per share purchase price of each share of NHC's shares shall be $233.00 per share.

It was Pokala's burden to prove entitlement to $233.00 per share for his 4500 shares in NHC. In attacking the jury's adverse finding, he must show that the evidence establishes, as a matter of law, all vital facts in support of his entitlement to $233.00 per share. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). However, it was NHC's burden to prove that Pokala waived that claim, and Pokala must show that no evidence supports the jury's finding that he waived it. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *ASI Techs., Inc. v. Johnson Equip. Co.*, 75 S.W.3d 545, 548 (Tex. App.–San Antonio 2002, pet. denied).

Until his signed Employment Agreement was found, Pokala denied having signed an employment agreement. When the contract was found, he no longer denied its existence. Pokala filed his original counterclaim, including a claim for breach of Paragraph 15 of the Employment Agreement, on February 2, 2010, after his signed Employment Agreement was found. Assuming

17

that taking the position that he never signed an employment agreement constituted waiver of rights under the agreement at the time he denied its existence, any waiver was later rescinded by the time of trial when the original Employment Agreement had been found and Pokala had filed a counterclaim for breach of the Employment Agreement and Buy-Sell Agreement. At trial, he was seeking affirmative relief under those documents, claiming the right to be paid for his shares. While the evidence may show that Pokala waived any rights pursuant to the Employment Agreement prior to February 2, 2010, reasonable and fair-minded jurors could not determine that as of February 2, 2010, he had the intent to waive any rights under the Employment Agreement. *See City of Keller*, 168 S.W.3d at 827.

Pokala's failure to resign from the hospital cannot be considered waiver. The trial court explained that "I don't believe that 3.10 controls the employment agreement as far as the conditions precedent. . . . Section [sic] 15 of the contract only refers to Section 3.8 and not the conditions precedent. So, it only applies to the value per share, which was the $233 per share." It would be incongruous for the trial court to instruct the jury that it could find that Pokala waived his claim to the value of his shares pursuant to Paragraph 15 based on his failure to resign from the hospital, a condition precedent located in Section 3.10, after having ruled that Section 3.10 does not apply to Paragraph 15. Further, we have determined that Section 3.10 is invalid and therefore could not be the basis of waiver of rights under Paragraph 15.

There is no dispute that Pokala purchased 4500 shares in NHC. Paragraph 15, by way of Section 3.8, indicates that the parties agreed the purchase price is $233.00 per share. Thus, Pokala established his right to receive $233.00 per share for his interest in NHC as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241. Because there is no evidence that Pokala had the intent to waive his claim under Paragraph 15, there is no evidence to support the jury's finding of "no" to Question 4. *See Exxon Corp.*, 348 S.W.3d at 215. We sustain Pokala's fourth issue.

CATH LAB DISTRIBUTIONS

In 1996, Guniganti and Pokala started East Texas Cardiovascular Labs, L.L.C., known as the Cath Lab, as partners with a 65%-35% split. Guniganti is the majority owner. Section 4.01 of the Cath Lab's Regulations provides that "Net Cash Flow" for each fiscal year shall be

18

distributed to Guniganti and Pokala in proportion to their "Sharing Ratios." That section defines Net Cash Flow as

> all cash funds derived by the [Cath Lab] (including interest received on reserves, borrowings, and capital transactions), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses, debt payments, capital improvements, replacements, and establish reasonable reserves for future expenses and costs as determined by a Majority interest.

Among Pokala's claims is a claim for breach of contract for failure to distribute Pokala's interest in the Cath Lab since 2006. In Question 5, the jury found that the Cath Lab failed to distribute to Pokala his share of the Net Cash Flow in 2009. In Question 6, the jury found that the reasonable value of Pokala's sharing ratio of any distributions under Section 4.01 is $45,906.70.

**2009 Net Cash Flow**

In its second issue, the Cath Lab contends that there is legally insufficient evidence to support the jury's award to Pokala for his 2009 share of the net cash flow of the Cath Lab. While agreeing that Pokala retains an interest in the Cath Lab and is entitled to share in any distribution of net cash the Cath Lab might make, the Cath Lab argues that there is no evidence that the Cath Lab made a distribution. It asserts that the tax preparer mischaracterized a guaranteed payment as a distribution on the 2009 tax return.

Where the appellant is attacking the legal sufficiency of the evidence supporting an adverse finding on an issue for which he did not have the burden of proof, he must show that no evidence supports the jury's adverse finding. *Exxon Corp.*, 348 S.W.3d at 215. Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id*.

Pokala's expert witness, Lori Land, a certified public accountant, reviewed the Cath Lab's records, including federal tax returns. She explained that, in 1997 and 1998, Guniganti and Pokala received distributions of the net cash flow from the Cath Lab. From 1999 through 2005, there were no distributions. In those years, all payments received by both doctors were guaranteed payments that are payments for services or use of capital; that is, payments in those years were for management services. In 2006, there was a $35,000.00 guaranteed payment to

19

Pokala and an $895,000.00 guaranteed payment to Guniganti. In 2007 and 2008, Pokala received zero, while Guniganti received $736,785.00 in 2007 and $661,960.00 in 2008 as guaranteed payments. In 2009, neither doctor received a guaranteed payment, but $131,162.00 was distributed to Guniganti. Land explained that the records show the total net cash flow in 2009 was $143,827.00. The records do not indicate what happened to the $12,665.00 difference. She testified that Pokala was entitled to 35% of the $143,827.00, or $50,339.00, in 2009.

Certified public accountant James T. Davis testified on behalf of Guniganti. He explained that, under the Cath Lab's regulations, a guaranteed payment is compensation for services in management as designated by Guniganti. He explained that, since Pokala has not worked at the Cath Lab since February 2006, Guniganti could not allocate a guaranteed payment to Pokala. Additionally, according to the regulations, after payment of expenses and debt, to the extent Guniganti permits it, a distribution is made in the profit sharing ratio consistent with ownership interests. Guniganti has the right to determine if a distribution is made, but if he does, it has to be in sharing ratios. Davis testified that from 2001 through 2008, neither doctor received a distribution. He explained that the 2009 return is the only one that does not show a guaranteed payment. Davis acknowledged that the 2009 tax return shows a cash distribution of $131,162.00 to Guniganti, but he believed it to be an error. He testified that "[t]his distribution is actually a guaranteed payment." He stated that he had a conversation with the individual who prepared the 2009 return, and it is his understanding that the return will be amended to show that the distribution was actually a guaranteed payment as payment for Guniganti's services. Davis explained that Pokala is still a 35% owner and, at best, has a 35% interest in $25,000.00 of capital at the end of 2009. He testified that Pokala is not entitled to 35% because he did not earn it.

The record shows that, as majority owner, Guniganti could pay himself any amount he chose for his management services in the form of a guaranteed payment. If all money is paid out as guaranteed payments, there is nothing left to distribute as profits. However, the Cath Lab would distribute any remainder, the net cash flow, in the doctors' proportionate shares. Pokala was to receive 35% and Guniganti was to receive 65%. Even at trial, Pokala remained a 35% owner. Thus, he was entitled to 35% of any distribution.

20

The tax return is some evidence that there was a 2009 distribution. NHC and Guniganti, however, argue that the jury could not rely on the tax return because Davis's testimony was uncontroverted and conclusively negated the evidence that there was a distribution. They assert that the jury is "not free to believe testimony that is conclusively negated by undisputed facts." They characterize Davis's testimony as evidence of the admitted mistake of an inexperienced tax preparer who intended to correct the mistake by amending the return to reflect a guaranteed payment rather than a distribution. We do not agree that Davis's testimony that the "distribution" was in error and should have been a "guaranteed payment" was conclusive. The supreme court has held that evidence is conclusive only if reasonable people could not differ in their conclusions, a determination that will depend on the facts of each case. *City of Keller*, 168 S.W.3d at 816. Here, Davis's testimony does not prove that the tax return is erroneous. It is speculation to assume that there was no distribution in 2009 based on the fact that neither doctor received a distribution from 2001 to 2008. Expert opinion must be supported by facts in evidence, not conjecture. *Marathon Corp. v. Pitzner*, 106 S.W3d 724, 729 (Tex. 2003) (per curiam). Further, a conclusory statement by an expert witness is not relevant evidence and cannot support a judgment. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). While jurors cannot substitute their opinions for undisputed truth, Davis's testimony does not rise to the level of undisputed truth. *See City of Keller*, 168 S.W.2d at 817. Reasonable people could differ in their conclusions about whether the income tax return was in error. Therefore, the jury could disregard Davis's testimony. *See id*. at 816-17.

Guniganti's 2009 distribution was in the amount of $131,162.00. Thirty-five percent of that amount is $45,906.70, precisely what the jury awarded to Pokala for his sharing ratio of distributions due pursuant to the Cath Lab regulations. The evidence before the jury was legally sufficient to enable reasonable and fair-minded people to make this finding. *See id*. at 827. We overrule the Cath Lab's second issue. We need not reach Pokala's cross-point, which is contingent upon this issue being sustained.

## 2006-2008 Net Cash Flow

In his fifth issue, Pokala contends the trial court erred in refusing to submit a jury question on his claim that the Cath Lab breached their contract by failing to distribute his portion of the net cash flow for the years 2006 through 2008. He notes that, in the years 1999 through

2005, the Cath Lab's tax returns designated payments to both doctors as guaranteed payments although the payments were made in proportion to their ownership interests like distributions of profits. Therefore, his argument continues, the jury could have found that those payments were for distributions of net cash flow rather than guaranteed payments for management services.

Rule 278 of the Texas Rules of Civil Procedure requires the submission of questions to the jury raised by the written pleadings and the evidence. TEX. R. CIV. P. 278; *Grohman v. Kahlig*, 318 S.W.3d 882, 888 (Tex. 2010) (per curiam). A court may refuse to submit a question if no evidence exists to warrant its submission. *Grohman*, 318 S.W.3d at 888.

To prove his breach of contract claim, Pokala must prove that, for any of the years from 2006 through 2008, there existed "Net Cash Flow" in the Cath Lab's coffers that was not distributed. Land testified that there were guaranteed payments in those years. The Cath Lab's tax returns for years 2006 through 2008 indicate that no distributions were made in those years. Thus, the material facts germane to this issue were not disputed. The issue was conclusively established as a matter of law, and therefore the trial court correctly refused to submit it to the jury. *Id*.

### Excluded Testimony

Pokala contends that the trial court erroneously excluded portions of his expert witness's testimony and that testimony supports his argument that the trial court erred in refusing to submit a jury question regarding distribution of his portion of the net cash flow for the years 2006 through 2008. The trial court excluded Lamb's calculation of how much the Cath Lab owed Pokala for distributions for 2006 through 2009 because her calculations did not include an amount credited for Guniganti's management services. Lamb was never given any figures showing what Guniganti received for his services in the management of the company. Pokala argues that whether the payments were correctly characterized on the tax returns is a fact question and the credibility of Lamb's testimony is dependent on the jury's resolution of that underlying fact question. Therefore, he argues, it is a question of credibility, not admissibility. Pokala also contends the trial court erred in excluding Lamb's opinion that the payments to Guniganti from 2006 through 2008 were improperly characterized as guaranteed payments.

Guniganti objected, in part, on the ground that Pokala failed to disclose Lamb's calculations and testimony in response to discovery requests. Pokala contends that he disclosed

22

this evidence in Lamb's affidavit submitted in support of Pokala's motion for summary judgment. In that affidavit, Lamb explained that in some years, the Cath Lab's tax returns showed "guaranteed payments" to the doctors in a 65-35 split, which would be appropriate for distributions. She stated that "it would appear that Guniganti improperly retained one hundred (100%) percent of the distributions characterized as 'guaranteed payments' contrary to the Sharing Ratio provided in the Regulations." The affidavit does not incorporate Lamb's calculations of the amount allegedly owed Pokala. With certain exceptions not applicable here, evidence that was not timely disclosed may not be introduced. TEX. R. CIV. P. 193.6.

The admission and exclusion of evidence is committed to the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). An expert's opinion must be relevant to the issues in the case and based upon a reliable foundation. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002). An expert's testimony is unreliable if it is no more than subjective belief or unsupported speculation. *Id*. at 629. The amount of Dr. Pokala's loss must be shown by competent evidence with reasonable certainty. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Further, recovery of lost profits must be predicated on a complete calculation. *Id*. at 85.

The Cath Lab regulations call for payment to Guniganti for his management services, his "guaranteed payment," before determining what amount, if any, is to be paid to the doctors for distributions. Lamb's calculations did not include an amount to be paid to Guniganti as reasonable compensation for his management services. Therefore, her calculations are not complete. The absence of that guaranteed payment amount results in a speculative amount for distributions, making the complained of calculations and testimony unreliable. *Zwahr*, 88 S.W.3d at 629. The proffered evidence could confuse or mislead the jury. *See* TEX. R. EVID. 403. Likewise, Lamb's testimony that the payments to Guniganti were incorrectly categorized as guaranteed payments is mere conjecture and unreliable. *Zwahr*, 88 S.W.3d at 629. Contrary to Pokala's assertion, this is not really a matter of credibility. In the absence of Lamb's unadmitted testimony, there is no evidence raising a question about whether the income tax returns for 2006 through 2008 were erroneous.

Therefore, the trial court did not abuse its discretion in refusing to admit Lamb's calculations and testimony regarding the guaranteed payments for 2006 through 2008. *See*

23

*Alvarado*, 897 S.W.2d at 753. This evidence cannot be used to show Pokala's entitlement to 35% of the Cath Lab's net cash flow for the years 2006 through 2008. Because the issue of Pokala's entitlement to distributions for those years was determined against him as a matter of law, the trial court did not err in refusing to submit Pokala's requested jury question. We overrule Pokala's fifth issue.

<u>UNJUST ENRICHMENT</u>

In their third issue, NHC and Guniganti contend that the jury's finding that Pokala was not unjustly enriched when Guniganti satisfied a loan from Nacogdoches Memorial Hospital to NHC is insupportable as a matter of law and against the great weight of the evidence. They argue that Pokala's 45% share in the heart clinic was accompanied by a like share of the repayment burden, yet Guniganti alone repaid the debt through his services at the hospital. They argue that Pokala received a substantial financial benefit that the heart clinic bought with Guniganti's uncompensated hospital services.

## Standard of Review

When the party who had the burden of proof at trial attacks the legal sufficiency of an adverse finding, that party must show that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co.*, 46 S.W.3d at 241. In our review, we first examine the record for evidence supporting the adverse finding, crediting favorable evidence, if a reasonable jury could, and disregarding evidence to the contrary, unless a reasonable jury could not. *See Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *Dow Chem Co.*, 46 S.W.3d at 241. If there is no evidence to support the finding, we examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem. Co.*, 46 S.W.3d at 241. We will sustain the issue only if the contrary proposition is conclusively established. *Id*. A matter is conclusively established only if reasonable people could not differ in their conclusions. *City of Keller*, 168 S.W.3d at 816.

When reviewing a factual sufficiency challenge to an issue upon which that party had the burden of proof, the moving party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the

24

evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*. The reviewing court may not substitute its opinion for that of the jury, as it is the jury's role to judge the credibility of witnesses, to assign the weight afforded their testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Ford v. Panhandle & Santa Fe Ry. Co.*, 252 S.W.2d 561, 563 (Tex. 1952).

## Applicable Law

Unjust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay. *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.–Dallas 2006, no pet.). Also, unjust enrichment is found under circumstances in which one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Unjust enrichment is not a proper remedy merely because it might seem generally fair that some recompense be afforded to the claimant or because the benefits to the person sought to be charged amount to a windfall. *Id*. at 42. To recover under an unjust enrichment theory, the benefits to the other party must be actually unjust under the principles of equity. *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.–Corpus Christi 2002, pet. denied).

## Analysis

In 2004, while Pokala was still working at NHC, Nacogdoches Memorial Hospital loaned $300,000.00 to NHC to hire two internal medicine doctors. The contract was a guarantee that each physician would make $150,000.00 a year. In return, those physicians would promise to provide indigent care in the emergency room. The guaranteed period was for one year and their payback period was four years. The money could be paid back by an NHC doctor taking calls in the hospital emergency room for which NHC would be credited. Additionally, NHC would be credited up to 20% for every year up to five years that the newly hired doctor stayed. Guniganti signed a guarantee in his capacity as president of NHC promising that, if either doctor left before fulfilling his or her obligation, Guniganti would offer the same services or give the money back. Guniganti testified that it was like guaranteeing a note for someone else. He said that he talked

25

to Pokala about the arrangement. Pokala testified that Guniganti never consulted him about bringing in new doctors. Instead, Guniganti merely made arrangements for their employment at the heart clinic.

Both of the new doctors left the practice before meeting their obligation and after Pokala left NHC. The contract required the debt to be repaid within thirty days of each doctor's departure. Hayward testified that, when the debt came due, he looked to Guniganti for repayment because he was the only doctor at NHC at the time. Hayward tried to get Guniganti to simply write a check to repay the loan, but he was unwilling to do that. Hayward explained that how Guniganti wanted to repay was up to him, and the doctor offered to repay in time. Accordingly, the hospital allowed for coverage on the internal medicine schedule to be provided by Guniganti pursuant to Guniganti's wishes, beginning in June 2007. The obligations were paid off in August 2009. Over those twenty-six months, Guniganti generated additional revenue for NHC in an amount greater than the debt owed to the hospital by virtue of the time spent working off the indebtedness. Guniganti never suggested that Pokala should have the opportunity to work off any of the debt.

In Question 1, the jury answered in the negative when asked if Guniganti's agreement to work off NHC's obligation to Nacogdoches Memorial Hospital resulted in Pokala's being unjustly enriched. The jury was instructed that

> [a] party is unjustly enriched when it obtains benefits that in equity and good conscience it ought not to keep. A party may recover for unjust enrichment when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.
>
> Recovery under unjust enrichment is not dependent on wrongdoing by the opposing party.

Hayward testified that the method of repayment was up to Guniganti. Guniganti chose to satisfy the debt by working in the hospital emergency room. Pokala was not consulted about repayment of the debt. Any benefit Pokala received was passive, occurring after he left the clinic. There is no evidence of fraud, duress, or the taking of an undue advantage. In light of the fact that Guniganti chose the method of repayment and Pokala never had the opportunity to repay his share of the debt, the jury could have found that the benefit to Pokala was not "actually unjust."

26

*See Mowbray*, 76 S.W.3d at 679. The evidence would allow reasonable and fair-minded people to answer Question 1 in the negative. *See City of Keller*, 168 S.W.3d at 816. Further, the finding is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co*., 46 S.W.3d at 241-42. The evidence is legally and factually sufficient to support the jury's answer to Question 1. We overrule NHC and Guniganti's third issue.


### ATTORNEY'S FEES

In their fourth and fifth issues, NHC, Guniganti, and the Cath Lab contend that the trial court erred in holding Guniganti personally liable for any recovery and that the attorney's fee awards should be modified. They argue that all attorney's fee awards to Pokala should be reversed except the award of $32,030.00 for a summary judgment declaration interpreting the parties' stock sale agreement. Specifically, they contend the awards for fees attributable to work done on NHC's claim for breach of the covenant not to compete and for Pokala's claim for payment under the Cath Lab regulations should be reversed based on their arguments on the merits of those claims in issues one and two. They further argue that the claim for payment under the Cath Lab regulations will not support an award for attorney's fees. Finally, they argue that NHC should be awarded attorney's fees incurred in prosecuting its claim for liquidated damages under Pokala's employment contract.

After awarding actual damages to Pokala against NHC and East Texas Cardiovascular Labs, the court ordered NHC and Guniganti individually to pay $190,755.00 in attorney's fees, and ordered Guniganti individually and East Texas Cardiovascular Labs to pay $24,580.00 in attorney's fees. The amount of $190,755.00 is the compilation of two separate awards. It includes $158,725.00 for fees incurred by Pokala in defending NHC's claim for breach of the Employment Agreement's covenant not to compete and $32,030.00 for fees incurred by Pokala in defending against Guniganti's cause of action based on the Stock Sale and Purchase Agreement, which was disposed of by summary judgment. Pokala agrees that the $158,725.00 should be assessed against NHC only, and not Guniganti individually, and the $32,030.00 should be assessed against Guniganti individually, and not against NHC. Additionally, Pokala agrees that he incurred $24,580.00 in prosecuting his breach of contract claim against the Cath Lab and

27

therefore, the trial court's award of $24,580.00 should be against the Cath Lab only and not against Guniganti individually.

We disagree with the Cath Lab's argument that the claim for payment under the Cath Lab regulations will not support an award of attorney's fees. The Cath Lab is a limited liability company. The Cath Lab regulations, the basis of Pokala's claim for his share of distributions, are a contract. *See **Potter v. GMP, L.L.C.**, 141 S.W.3d 698, 705 (Tex. App.–San Antonio 2004, pet. dism'd). As explained above in our discussion of NHC and the Cath Lab's first and second issues, the trial court correctly found in favor of Pokala on NHC's claim for breach of the covenant not to compete, and the evidence supports the jury's finding that the Cath Lab owes Pokala for his share of distributions under the Cath Lab regulations. Pokala is entitled to reimbursement for attorney's fees incurred regarding those issues on which he was the prevailing party. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008).

We sustain Guniganti's fourth issue to the extent he complains of the attorney's fee awards against Guniganti individually for Pokala's defense of the breach of the covenant not to compete claim and Pokala's prosecution of his claim for payment under the Cath Lab regulations. We sustain the fifth issue to the extent NHC complains of the attorney's fee award against NHC for Pokala's defense of Guniganti's cause of action based on the Stock Sale and Purchase Agreeement. We overrule the remainder of NHC's, Guniganti's, and the Cath Lab's complaints under issues four and five.


## CONCLUSION

The covenant not to compete in Paragraph 19 of the Employment Agreement is unenforceable. Therefore, the trial court properly directed a verdict for Pokala on NHC's claim for liquidated damages based on that paragraph. The trial court did not err in refusing to submit a jury question on Pokala's claim that the Cath Lab failed to distribute his portion of the net cash flow for the years 2006 through 2008. Because of the unenforceable covenant not to compete contained in Section 3.10 of the Buy-Sell Agreement, NHC is required as a matter of law to purchase Pokala's 4500 shares in NHC at $233.00 per share. Therefore, we *render* judgment for Pokala in the amount of $1,048,500.00 on his cause of action against NHC for breach of the Buy-Sell Agreement.

The attorney's fee award to Pokala in the amount of $190,755.00 is **modified** to accurately reflect liability. Of that amount, $158,725.00 is assessed against NHC, but not against Guniganti individually. The remaining $32,030.00 is assessed against Guniganti individually, but not against NHC. Further, the attorney's fee award to Pokala in the amount of $24,580.00 is assessed against East Texas Cardiovascular Lab, Inc., but not against Guniganti individually. We **delete** the award of attorney's fees to Guniganti and NHC in the amount of $100,302.67, which was based on a successful defense of Pokala's claim, pursuant to the Buy-Sell Agreement, to payment of $233.00 per share for his interest in NHC. Finally, we **render** attorney's fees for Pokala in the amount of $58,615.00 for his claim for breach of the Buy-Sell Agreement.

In all other respects, we **affirm** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered February 6, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

29



# COURT OF APPEALS

## TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 6, 2013**

## NO. 12-11-00133-CV

### NACOGDOCHES HEART CLINIC, P.A.,
### PRABHAKAR R. GUNIGANTI, M.D., AND
### EAST TEXAS CARDIOVASCULAR LABS, LLC,
Appellants/Cross-Appellees

V.

### VIJAY R. POKALA, M.D. d/b/a
### NACOGDOCHES CARDIAC CENTER,
Appellee/Cross-Appellant

---

Appeal from the 145th Judicial District Court
of Nacogdoches County, Texas. (Tr.Ct.No.C22,256-2006)

---

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, it is the opinion of this court that there was error in the judgment of the court below.

It is ORDERED, ADJUDGED and DECREED by this court that judgment is **RENDERED** for Vijay R. Pokala, M.D. in the amount of $1,048,500.00 on his cause of action against Nacogdoches Heart Clinic, P.A. for breach of the Buy-Sell Agreement.

It is FURTHER ORDERED, ADJUDGED AND DECREED that the attorney's fee award to Vijay R. Pokala, M.D. in the amount of $190,755.00 be **MODIFIED** to accurately reflect liability. Of that amount, $158,725.00 is assessed against Nacogdoches Heart Clinic, P.A., but not against Prabhakar R. Guniganti, M.D. individually. The remaining $32,030.00 is assessed against Prabhakar R. Guniganti, M.D. individually, but not against Nacogdoches Heart Clinic, P.A. Further, the attorney's fee award to Vijay R. Pokala, M.D. in the amount of $24,580.00 is assessed against East Texas Cardiovascular Labs, Inc., but not against Prabhakar R. Guniganti, M.D. individually.

It is FURTHER ORDERED, ADJUDGED AND DECREED that the award of attorney's fees to Prabhakar R. Guniganti, M.D. and Nacogdoches Heart Clinic, P.A. in the amount of $100,302.67 is **DELETED**.

It is FURTHER ORDERED, ADJUDGED AND DECREED that judgment is **RENDERED** for Vijay R. Pokala, M.D. for attorney's fees in the amount of $58,615.00 for his claim for breach of the Buy-Sell Agreement.

It is FURTHER ORDERED, ADJUDGED AND DECREED that, as **MODIFIED**, the remainder of the trial court's judgment is **AFFIRMED**.   All costs of this appeal are hereby adjudged against Prabhakar R. Guniganti, M.D., Nacogdoches Heart Clinic, P.A., and East Texas Cardiovascular Labs, LLC in accordance with the opinion of this court; and it is ORDERED that this decision be certified to the court below for observance.

Brian Hoyle, Justice.

*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*